Omar A. EUCEDA, Appellant,

v.

UNITED STATES, Appellee.

No. 06–CF–1583.

District of Columbia Court of Appeals.

Argued Oct. 16, 2012.

Decided May 30, 2013.

---

Deborah A. Persico for appellant. Joseph Virgilio was on the brief for appellant.

Leslie Ann Gerardo, Assistant United States Attorney, with whom Ronald C. Machen, Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Gary Wheeler, Assistant United States Attorney, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY, THOMPSON, and BECKWITH, Associate Judges.

BECKWITH, Associate Judge:

A jury note puzzlingly "fell through the cracks"[1] during deliberations in appellant Omar Euceda's trial on felony murder while armed, attempted armed robbery, and weapons charges. When Mr. Euceda's lawyer opened the file to begin work on an appeal, he discovered the note—posing two detailed questions about an element of attempted armed robbery—but found no record that the trial court ever had responded to the questions. Counsel also determined that neither Mr. Euceda's trial counsel nor the government had been informed of the note's existence or given a chance to react to it.

Four years after the trial, not a single juror questioned about the note remembered it in any detail, and two days of hearings yielded little definite information about the specific note or any response from the court. Taking the jurors' testimony as a whole, however, it appears that someone answered the note after all, and there is evidence that it was the judge's courtroom clerk, not the judge, who formulated the response.[2] Two jurors remembered being told, in response to "a note," to refer back to instructions the judge already had given them. And it remains clear that neither defense counsel nor Mr. Euceda was informed of what the trial judge later called "a very substantive note" or was allowed an opportunity to shape the court's response.

While the jurors' supplemental testimony is far from conclusive, we are presented with an adequate record on which we hold that because a clerk received and responded to the note without alerting Mr. Euceda or his counsel, Mr. Euceda was deprived of his constitutional right to "the presence of defense counsel and the accused at all critical stages of the prosecution." *United States v. (James) McCoy*, 429 F.2d 739, 742 (D.C.Cir.1970); *see also Winestock v. United States*, 429 A.2d 519, 528 (D.C. 1981) ("[A] defendant and his counsel have a right to be informed of all communications from the jury and to offer their reactions before the trial judge undertakes to respond."). This error is obvious, undisputed, and implicates important rights at the crucial moment of a trial when a confused jury seeks further instruction from the trial judge, whose "influence ... on the jury is necessarily and properly of

---

1. The quoted words are the trial judge's.

2. Although this opinion at times refers to "the trial court" receiving or answering the note, the unique facts of this case make that term imprecise. While it appears the courtroom clerk, and not the judge, responded to the note, we use the term "trial court" primarily to represent the jurors' perspective, from which it would have appeared that the note was being addressed through official channels, and to reflect the trial court's duty to ensure that jury notes are disposed of properly.

great weight." *Bollenbach v. United States,* 326 U.S. 607, 612, 66 S.Ct. 402, 90 L.Ed. 350 (1946). The circumstances and substance of the response in all likelihood prejudiced Mr. Euceda, failing to clear up the jury's confusion over the critical question whether Mr. Euceda attempted an armed robbery and thus committed felony murder in killing Walter Kirkland, the decedent in this case. *See id.* at 612–13, 66 S.Ct. 402. We reverse all but one of Mr. Euceda's convictions and remand for a new trial.

## I. Background

### A. The Shooting of Walter Kirkland

Appellant Euceda and another young man, Ivan Gallow, were accused of trying to rob two drug dealers—Walter Kirkland and Deandre Abbott—on the evening of November 9, 2003, and killing Mr. Kirkland in the process. A jury convicted Mr. Euceda in August 2006 of all the counts in the indictment against him: first-degree felony murder while armed (Count 1);[3] two counts of attempted armed robbery, one against Mr. Kirkland (Count 2) and the other against Mr. Abbott (Count 3);[4] two counts of possession of a firearm during the commission of a crime of violence or dangerous offense (PFCV) (Counts 4 and 5);[5] and carrying a pistol without a license (CPWL) (Count 6).[6] Count 1 of the indictment expressly charged Mr. Euceda with armed felony murder during the commission of Count 2. Mr. Euceda's conviction for felony murder thus depended on the jury finding that he attempted to rob Mr. Kirkland.

At trial, the performances of the government's main eyewitnesses were not, as the government acknowledged in its closing argument, "Hollywood" material. Though testimony from both men—Ivan Gallow and Deandre Abbott, Mr. Kirkland's partner in selling marijuana that night—implicated Mr. Euceda in the shooting of Mr. Kirkland, this testimony was often confusing and contradictory. The two men also disagreed with each other on key interactions between the accused robbers and the drug dealers.

Mr. Abbott testified that he and his cousin Mr. Kirkland, both African–American, were approached by two Latino men as they walked in the 3200 block of 11th Street in Northwest Washington, D.C. One of the Latino men, whom Mr. Abbott later identified in a photographic lineup as Mr. Gallow, asked them if they had an ounce of marijuana to sell. Mr. Kirkland replied that they did not have that much but could sell them a smaller amount. The shorter of the Latino men, whom Mr. Abbott identified in a second photo lineup as Mr. Euceda, never said anything but kept his hands in his pockets and "made [Abbott] nervous." As Mr. Kirkland showed Mr. Gallow two dime bags of marijuana and Mr. Gallow pressed him for an ounce instead, Mr. Euceda "started moving in the street and everything, like he was trying to reach for something," so Mr. Abbott "took off running" and "didn't look back." As he turned a corner, he heard a gunshot. On cross-examination, Mr. Abbott added details to his testimony, including that Mr. Gallow "got the weed from us" then "asked what I had in my pocket." Mr. Abbott also said Mr. Gallow "reached for my pockets [and] I smacked his hand away, and that's when I took off running."[7]

---

3. D.C.Code §§ 22–2101, –4502 (2001).

4. D.C.Code §§ 22–2802, –4502 (2001).

5. D.C.Code § 22–4504(b) (2001).

6. D.C.Code § 22–4504(a) (2001).

7. Mr. Abbott contradicted or muddied many aspects of this story as his testimony continued. At various times, he claimed that he ran

Mr. Gallow, on the other hand, testified that the two African–American men were trying to rob *them*, not the other way around,[8] and he told a much longer story of their interactions that night. His recounting of the night included multiple run-ins between the two pairs of young men, and a meeting he and Mr. Euceda had with another drug dealer. Mr. Gallow testified that an "associate" he knew as "Omar" came to his house the evening of the shooting, showed him a gun he stole, and said he wanted to go out and "steal a car stereo." As soon as they left the house, "the plan changed": "Omar"—the man the government insisted, not unconvincingly, was Omar Euceda[9]—now wanted to "rob some drug dealers." The plan was that Mr. Gallow would translate for Mr. Euceda, telling the drug dealer that they wanted an ounce of marijuana, and when the dealer led them away from the area to get the drugs, Mr. Euceda would use the gun to rob the dealer.

On the way to an alley near "Hobart . . . where they sell drugs," two African–American men saw Mr. Gallow and Mr. Euceda from across the street and made "signs [asking], do we want to buy some drugs." Mr. Gallow told them no, and he and Mr. Euceda continued to the alley, where they met another drug dealer whom they "were going to just rob" if everything went according to plan. When Mr. Gallow asked for an ounce, however, the dealer left and returned with the drugs, spoiling their plan of leaving the area with the dealer. After smelling the drugs, Mr. Gallow and Mr. Euceda realized that there were people around, so they left. Though he noticed the two African–American men behind them, Mr. Gallow ignored them, "just happy the whole situation [with the other dealer] didn't happen."

Mr. Gallow and Mr. Euceda ran into the two men again, however, as they noticed

---

because his cousin told him to run; that he looked back as he was turning the corner and saw Mr. Euceda "grabbing something out of his pocket"; that he saw a gun "in the shorter guy's hands"; that "I really couldn't get a good glance" but that "he had something in his hands" and "it looked like a gun"; that "it might have been a gun"; that "I ain't see no gun"; that he "didn't see [Mr. Euceda] shoot nobody"; and that when Mr. Abbott ran, Mr. Kirkland "had [the marijuana] on him." He also (in what seems to have been a brief mistake) testified that Mr. Euceda "was basically the talker"; he later said that the taller man, Mr. Gallow, "was doing all the talking" and that Mr. Euceda "didn't open his mouth." Mr. Abbott also admitted that he had told the police at first that he was *not* selling drugs that evening, that the *taller* man had the gun and shot Mr. Kirkland, and that he in fact *saw* his cousin get shot. The government gave Mr. Abbott "use immunity" from prosecution for his testimony against Mr. Euceda.

8. The government impeached Mr. Gallow with sworn statements he made while pleading guilty to charges related to his involve-

ment in Mr. Kirkland's death. In that proceeding, the judge asked Mr. Gallow, "Are you pleading guilty because you're guilty of participating in the robbery that lead [sic] to the death of Mr. Kirkland?" Mr. Gallow answered yes. At Mr. Euceda's trial, Mr. Gallow attempted to explain his answer: "It was part of the plea offer to agree to that," he said, and he maintained that his admission at the plea was "a lie."

9. Mr. Gallow maintained that Mr. Euceda was not the same person as "Omar" and was not with him on the night of the shooting. Yet Mr. Gallow previously had pointed to a police photograph of a man he said was the "Omar" with him that night. A fingerprint specialist testifying for the government said that Mr. Euceda's fingerprints matched the fingerprints associated with the person in the photograph. Defense counsel also stipulated that the photo was of Mr. Euceda in 1999. In closing, however, as part of a misidentification defense, counsel argued that "Omar," not Mr. Euceda, was in fact the shooter and that Mr. Gallow was mistaken in thinking that the photo was of "Omar."

the men were following them on their way to Lamont Street to buy beer. Finally, one of the men went in front of Mr. Gallow and, with his back turned to Mr. Gallow, "grab[bed]" Mr. Euceda, turned him around, and said, "Come here." That is when Mr. Gallow heard shots. Mr. Gallow did not see either of the African–American men with a gun but knew that Mr. Euceda had a gun at the time he heard the shots. Mr. Gallow admitted that he at first told the police nothing of his and Mr. Euceda's plan to rob drug dealers. He told the police that the African–American men tried to rob him and Mr. Euceda, and he maintained in his trial testimony that this was true.

## B. Jury Instructions and Deliberations

Superior Court Judge (later Chief Judge) Lee Satterfield instructed the jury on August 3, 2006. He told jurors to consider separately each count of the indictment, and the evidence for each, and then instructed them on the elements of each offense. On the charge of felony murder while armed, Judge Satterfield told jurors, among other things, that they must find beyond a reasonable doubt: "1) that the defendant caused the death of the decedent; 2) that he did so while committing or attempting to commit robbery while armed; 3) that at that time of the offense, the defendant was armed with a pistol or firearm." For the charge of attempted robbery while armed, the judge began by telling the jurors that there were two counts to consider, "one relating to … Walter Kirkland … and one of those counts relates to Deandre Abbott." The elements of attempted armed robbery, the judge said, were:

1) that the defendant committed an act which was reasonably designed to commit the crime of robbery; 2) that at the time the act was committed, he acted with the specific intent to commit a rob-

bery; 3) that the defendant did more than prepare to commit the crime … his acts must have come dangerously close to completing the crime of robbery; and, 4) that at the time of the offense, the defendant was armed with a pistol or firearm.

Judge Satterfield then told the jurors that "[a] robbery occurs when a person takes property of some value from the immediate actual possession of a complainant" and continued with the remaining elements of robbery.

The jury began deliberating the afternoon of August 3, 2006, and soon sent out a note asking for two pieces of information: Ivan Gallow's grand jury testimony and Gallow's statements to police. The note was signed by the foreperson and initialed as received by the courtroom clerk at 3:31 p.m. on August 3, 2006. In response to the note, Judge Satterfield called the case in open court, informed the government and defense counsel about the note, and with the agreement of the parties provided the jury a written answer stating that the information was not available because Ivan Gallow did not testify before the grand jury and because his police statements were not admitted into evidence. The record shows that the jury also sent an undated note, which was not marked as received by the courtroom clerk, asking to see the pistol admitted into evidence, and another note marked as received at 10:01 a.m. on August 4, 2006, asking to "see the weapon again."

On Friday, August 4, 2006, Judge Satterfield presided only from 9:50 a.m. until 12:30 p.m., after which other Superior Court judges had agreed to handle any issues in his cases. He was then on vacation the next week, so when the jury sent a note at 2 p.m. on Monday, August 7, Judge James Boasberg addressed it. After a

conference call between the parties and Judge Satterfield, Judge Boasberg called the case in open court and put the court's response on the record, with the government and Mr. Euceda's counsel present.[10] Mr. Euceda's counsel at this time put on record his motion for a mistrial, and Judge Boasberg denied the motion on instructions from Judge Satterfield. A fifth jury note on August 8, 2006, informed the court that the jury had reached a verdict.

## C. Discovery of the Sixth Jury Note

Mr. Euceda's appellate counsel discovered a sixth jury note after receiving his client's file. Signed by the foreperson, it was marked received by the courtroom clerk at 3:40 p.m. on Friday, August 4, 2006, the day Judge Satterfield stopped presiding at 12:30 p.m. It states, in its entirety:

> Judge Satterfield—We have a question about the charges of "attempt to commit robbery while armed." Concerning Element # 1, must the act or acts be focused specifically on the target individuals named in the 2 counts, or can they be focused on a more general class of possible targets? Again concerning Element # 1, must the act or acts have occurred as part of the interaction in which the shooting occurred, or may we consider any previous interaction that evening?

An investigation by appellate counsel, including contacts with the judges' clerks, the court's Reporting Division, Mr. Euceda's trial counsel, and the prosecutors involved in the case, showed that no court officer or employee knew anything about the note or could find any record of it being addressed by the court or counsel. Appellate counsel moved to vacate Mr.

Euceda's convictions because of the lack of an adequate record for appeal, but the court granted his alternative motion to supplement the record through this court's Rule 10(c) procedure for proceedings that were not recorded below or for which there is no transcript available. *See* D.C.App. R. 10(c).

The court took testimony from eight jurors, including the foreperson, during two days of hearings in October and December 2010. The foreperson testified that while the note was in her handwriting and was "clearly ... a question we asked [the judge]," she did not "specifically remember asking this question." She was "confident that anything we asked for, we got some sort of response on" but said that she had no specific memory of this note being answered. While none of the jurors remembered this specific note, and most did not remember how the court responded to notes in general,[11] one juror recalled "a note" for which "we talked about what the questions were." This juror testified: "I believe that the response that we received was that we needed to go back to what the instructions were or what the—what the statement was about the charges. But I do not remember who it came from." A second juror testified that "after having [been] contacted [by the court to testify] and [having] heard that there was a note involved I did recall being on the jury and that there was a note." He stressed that his testimony was "not with a hundred percent clarity" but said he remembered that "the court's clerk came in [to the jury room] and said there won't be any answers to these questions, just rely on ... the instructions you already have, they are

---

10. Mr. Euceda's counsel waived his client's presence at this proceeding.

11. One juror testified that all of the jurors' notes were responded to orally, yet there are only written responses in the record.

sufficient."[12]

Based on this testimony, Judge Satterfield certified a short "Rule 10(c) Statement of Evidence." Judge Satterfield found, based on the foreperson's testimony and the courtroom clerk's initials on the note, that "the foreperson prepared the note and submitted the note to the Court." The judge "infer[red]" that the note "was answered," "based on the testimony of five jurors who recall that their questions and/or notes were answered by this Court." He also found that "[t]he record ... shows that the jury was told to rely on the instructions that had previously been given," and he cited the testimony of the two jurors who mentioned the possibility of such an instruction. Finally, he wrote, "[t]here is no oral or written record showing that the Court gave any response to the note," and "[t]here is no oral or written record of the note being discussed with the parties' attorneys."

## II. Analysis

Mr. Euceda raises the following claims, among others, on appeal: (1) the supplemented record is inadequate to permit meaningful appellate review, requiring *per se* reversal, *United States v. Workcuff,* 422 F.2d 700 (D.C.Cir.1970); and (2) even if the record is adequate, the trial court's handling of the jury note was improper and deprived appellant of his Sixth Amendment right to counsel and to "the presence of defense counsel and the ac-

cused at all critical stages of the prosecution." *(James) McCoy,* 429 F.2d at 742.

## A. The Supplemented Record Is Adequate for Review.

Mr. Euceda first argues that the record available here concerning the "crucial stage" of jury deliberation and instruction is inadequate to permit appellate review. *See Workcuff,* 422 F.2d at 702. The government responds that the record is adequate because, taking the Rule 10(c) Statement of Evidence and the original record as a whole, Mr. Euceda's right to appeal has not been prejudiced by the lack of an original record showing exactly how the jurors' note on attempted armed robbery was handled. *See Lucas v. United States,* 476 A.2d 1140, 1142 (D.C.1984).

▮ While the trial court is required to keep a simultaneous verbatim transcript of all proceedings, Super. Ct.Crim. R. 36(1)(a), "[t]he absence of a complete transcript of the trial does not automatically mandate reversal ... even if it makes appellate review more difficult." *Egbuka v. United States,* 968 A.2d 511, 516 (D.C. 2009); *see also Cole v. United States,* 478 A.2d 277, 285–86 (D.C.1984). Instead, when the record has been supplemented through the process of Rule 10(c),[13] we ask "whether the particular omission from the transcript *prejudices* the defendant's right to appeal," either (1) by making it impossible for this court to determine whether a specific error raised by the appellant oc-

---

12. During a post-trial hearing, Judge Satterfield told the parties that the clerk who took the note in this case had indicated to him that while he had no specific memory of this note, his signature was on it and "his practice was to share it with the judge."

13. D.C.App. R. 10(c) states:
 If the transcript of a hearing or trial is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement must be served upon all other parties, who may serve objections or proposed amendments.... The statement and any objections or proposed amendments must then be submitted to the trial judge for settlement and approval ... [then] included by the Clerk of the Superior Court in the record on appeal.

curred, or (2) by preventing new appellate counsel from searching the record to determine whether error occurred. *Egbuka,* 968 A.2d at 516 (emphasis in original) (citing *Lucas,* 476 A.2d at 1142).

Appellant cites *Workcuff,* where the United States Court of Appeals for the District of Columbia Circuit refused to apply harmless error analysis to a missing transcript case, and argues that his case is also one that requires *per se* reversal. In *Workcuff,* a case that is binding authority in this jurisdiction, the D.C. Circuit automatically reversed the appellant's conviction where the judge gave a supplemental instruction to the jury, with counsel present, but no transcript was made of the proceeding. 422 F.2d at 701. Trial counsel for the government and the appellant submitted affidavits to supplement the record, but neither had an independent memory of the instruction, and the only evidence of its contents was the prosecutor's contemporaneous notes "taken in an arcane, highly personalized form of shorthand ... consist[ing] primarily of illegible scrawls." *Id.* In reversing Workcuff's conviction, the court stated that its review was "turned into an exercise in creative imagination" when the record was "replaced by the incomplete hearsay recollections of one of the parties," further noting that it had "found no cases applying the harmless error rule when the court reporter was absent during such a crucial stage of the trial as the instructions to the jury." *Id.* at 702.

In cases since then, this court has discussed *Workcuff's per se* reversal. But despite noting that *Workcuff* "caution[ed] against the affirmance of convictions on harmless error grounds in cases where an important portion of the transcript is not available on appeal," we have refused to adopt a rule "render[ing] every failure to provide a complete transcript on appeal *per se* reversible error." *Cole,* 478 A.2d at 281–82. The prejudice analysis reaffirmed in *Egbuka* now governs when such a failure requires reversal. *Egbuka,* 968 A.2d at 516.

We begin our prejudice inquiry by disentangling the complicated nature of the claim and the reconstructed record in this appeal. This case presents a unique use of Rule 10(c), which usually comes into play when a verbatim transcript of a particular proceeding was lost or is for some reason unavailable. *See Cole,* 478 A.2d at 283 (describing three uses of Rule 10 as an alternative to providing a verbatim transcript of a proceeding that took place in the trial court). The difference here is that there is no evidence that any proceeding took place at all, and so the rule was not used, as it normally is, to reconstruct a portion of a hearing or trial record through the *"post hoc* reports of counsel," *id.* at 282, or the trial judge's notes. The parties instead used the Rule 10(c) process to investigate the matter and expand the record, after which the judge considered the parties' proposed statements of evidence and issued his final "approved" statement including what are essentially findings of fact.

This use of the rule, though unusual, does not strike us as improper—and no party argues as much—given that when the Rule 10(c) proceedings were ordered, the nature of the court's response to the note was still unknown. We have held, moreover, that "the trial court may supplement the appellant's [proposed] statement with its own recollection or trial notes, or by consultation with counsel, or by holding a hearing on the matter." *Romero v. United States,* 956 A.2d 664, 668 (D.C. 2008) (citation omitted).

 As another threshold matter, we owe some amount of deference to the factual findings in Judge Satterfield's Statement of Evidence, which are based in part

upon his assessment of the witnesses' testimony during the Rule 10 hearing. *Cf. (Steven) McCoy v. United States*, 781 A.2d 765, 772 (D.C.2001) (deferring to the trial judge's assessment of a witness's credibility during a Rule 10 hearing); *United States v. Keskey*, 863 F.2d 474, 476–79 (7th Cir.1988) (trial court's reconstruction of the record under Fed.App. R. 10 must be accepted "unless it was intentionally falsified or plainly unreasonable"). But even while deferring to the judge's findings, this court also must closely consider the jurors' testimony about what happened as part of its duty to "examine the supplemented record to determine whether it is adequate to permit appellant a meaningful" appeal. *Cole*, 478 A.2d at 285. The evidence in the hearing testimony was sufficient, we think, to support Judge Satterfield's specific findings in the Statement of Evidence. Yet the Statement of Evidence also conveys implicitly, or perhaps leaves unsaid, certain facts that can be gleaned from the underlying evidence and from the conclusions Judge Satterfield drew from that evidence.

First and most fundamentally, neither the defendant nor his trial counsel was informed of the note or of any response to the note.[14] Second, in light of the jurors' most specific recollections, the known absence of the presiding judge at the time the jury submitted the note, and the lack of any remote suggestion that any other Superior Court judge even knew of the note, the judge's use of the passive voice in the Statement of Evidence (the note "was answered"; the jury "was told") inescapably signifies that it was not a judge who answered the jury's questions, but the courtroom clerk who received the note on a Friday afternoon after the presiding judge had left on vacation.[15] The juror who appeared to remember the most about a response from the court said that "the court's clerk came in [to the jury room] and said there won't be any answers to these questions, just rely on . . . the instructions you already have, they are sufficient." And Judge Satterfield, before issuing his Statement of Evidence, agreed with Mr. Euceda's appellate counsel that it "isn't highly likely" that a Superior Court judge would respond without notifying counsel since they "just don't do that," making it equally unlikely a judge ever was told about the note in the first place, particularly considering its "very substantive" content. Finally, it is significant that the trial court addressed in open court two other less substantive jury notes in this case, informing counsel and allowing them to shape the court's response, yet there is no record of the court addressing the attempted armed robbery note.

██ We thus have a record that suggests the following scenario: on the afternoon of Friday, August 4, 2006, the jury, through its foreperson, submitted a note, which was received by the clerk at 3:40 p.m. The clerk at some point returned to the jury room and told the jurors to refer

---

14. The judge found that "[t]here is no oral or written record of the note being discussed with the parties' attorney," arguably implying that it is possible the court consulted the parties but never recorded the fact. The parties on appeal do not dispute, however, that the note was never revealed to trial counsel or Mr. Euceda and that neither trial lawyer participated in the formulation of a response, and the record is totally lacking of such evidence.

15. The judge's choice of words is especially significant because the government had urged the court to find in its Statement of Evidence that "[t]he *trial court* responded to the . . . note." *Government's Response to Defendant's Motion for Approval and Certification of Statement of Evidence* at 6 (emphasis added).

back to their previous instructions, which he said were sufficient to answer their questions. The government, the defendant, and counsel never were aware that the note existed and thus never got a chance to address the note or the court's response. This record is adequate to identify, as we do later in this opinion, the specific error Mr. Euceda alleges—that the handling of the note violated his constitutional rights—and to assess whether the error was harmless. The lack of an original record here therefore did not prejudice Mr. Euceda, and the record is adequate for meaningful review. *Egbuka*, 968 A.2d at 516.

### B. The Erroneous Handling of the Jury Note Was Not Harmless.

Mr. Euceda next argues that if the record permits meaningful review, "the failure to give defense counsel an opportunity to address the note denied appellant the right to counsel." He cites precedent in this jurisdiction holding that the Sixth Amendment to the United States Constitution "requires the presence of defense counsel and the accused at all critical stages of the prosecution," *(James) McCoy*, 429 F.2d at 742, as well as the D.C. Circuit's statement in *Workcuff* that jury instruction is a "crucial stage" of the trial. 422 F.2d at 702. The government argues that Mr. Euceda did not sufficiently develop his Sixth Amendment claim, but if he did the error was harmless because the

court's response to the note was "substantively correct." In the government's view, we should evaluate the alleged error under the standard for nonconstitutional error, *see Kotteakos v. United States*, 328 U.S. 750, 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), while Mr. Euceda argues for the more exacting harmlessness standard for constitutional trial error, *see Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[16]

■ We begin by situating the error Mr. Euceda is alleging and by ascertaining whether and how to decide if the error was harmless. A defendant's right to be present and to have counsel present at trial—and thus the right not to have the trial court communicate ex parte with the jury—is based, as the *(James) McCoy* court said, in the Sixth Amendment but, as the Supreme Court subsequently explained, not in that amendment alone and not only in that amendment's guarantee of counsel. In *United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), the Supreme Court stated that the "right to presence" is rooted in the Sixth Amendment's Confrontation Clause, as well as the Fifth Amendment's guarantee of due process, both of which require the defendant's presence, and the presence of counsel, to protect the defendant's rights at stages of the trial where "a fair and just hearing would be thwarted by his absence." *Id.* at 526, 105 S.Ct. 1482 (citation

---

**16.** Mr. Euceda further argues that the trial court abused its discretion in that "the response allegedly given to the August 4, 2006, jury note was erroneous" under *Alcindore v. United States*, 818 A.2d 152 (D.C.2003). The government argues that the trial court issued an "appropriate response" urging jurors to refer back to previous instructions and thus did not abuse its discretion, and that any error in the instruction was harmless. Because we reverse on Mr. Euceda's Sixth Amendment claim, we find it unnecessary to

decide his erroneous instruction claim. The analysis under *Alcindore* is nevertheless relevant to whether the error we do find was harmless.

Mr. Euceda also notes briefly that "[i]f a clerk responded to the note, this, too, is highly improper" under *Hallmon v. United States*, 722 A.2d 26 (D.C.1998). We likewise do not find it necessary to decide this claim but address the circumstances giving rise to it in note 20, *infra*.

omitted); *see also Van Dyke v. United States,* 27 A.3d 1114, 1123 (D.C.2011). In *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983), moreover, the Supreme Court evaluated an ex parte communication case as involving alleged violations of "the right to personal presence at all critical stages of the trial *and* the right to counsel." *Id.* at 117, 104 S.Ct. 453 (emphasis added).

In this jurisdiction, as in the federal system, the right of the defendant and counsel to be present at all stages of the trial also arises from a court rule requiring the defendant's presence "at every stage of the trial including the impaneling of the jury and the return of the verdict." Super. Ct.Crim. R. 43(a); *see also* Fed. R.Crim.P. 43(a). Rule 43(a) "incorporates the protections afforded by the Sixth Amendment Confrontation Clause, the Fifth Amendment Due Process Clause, and the common law right of presence." *Welch v. United States,* 466 A.2d 829, 838 (D.C.1983).

▮ Although Mr. Euceda's case raises questions about the defendant's right to counsel as well as his right to presence, the essential event at issue here is a mid-deliberations ex parte communication between jurors and the trial court—or, as it appears, between jurors and the clerk acting ostensibly as the court's representative to the jury. This court has consistently evaluated ex parte communication claims under Rule 43(a) or the right to presence and subjected them to harmlessness analysis. It has not addressed how such an erroneous communication, which necessarily precludes participation by the defense lawyer, might implicate the right to counsel. *Cf. Walker v. United States,* 982 A.2d 723, 741–42 (D.C.2009) (rejecting as waived defendant's right-to-counsel-based claim of structural error due to an ex parte communication during a proceeding the court concluded was not a "critical stage"). In any event, Mr. Euceda does not contend that his claim involves structural error due to an alleged deprivation of the right to counsel,[17] and we therefore conclude that the crux of his argument is that he was deprived of "the presence of defense counsel and the accused at [a] critical stage[ ] of the prosecution." *(James) McCoy,* 429 F.2d at 742. Despite appellant's failure to style his claim under Rule 43(a) or the specific "right to presence" expressed in our cases, the *McCoy* rule he cites aligns with our jurisprudence concerning these rights. Indeed, the government in its response, and Mr. Euceda in his reply brief, cite to our cases along these lines—for example, *Van Dyke* and *Winestock v.*

---

17. *Compare French v. Jones,* 332 F.3d 430, 438–39 (6th Cir.2003) (holding that when counsel is absent during communication between trial court and jury, except in cases of "incidental contact," this is a structural violation of the right to counsel at all critical stages of the prosecution), *Ivory v. State,* 351 So.2d 26, 27–28 (Fla.1977) ("Any communication with the jury outside the presence of the prosecutor, the defendant, and defendant's counsel is so fraught with potential prejudice that it cannot be considered harmless."), *and State v. Robin,* 112 Ariz. 467, 543 P.2d 779, 779 (1975) ("Where the communication concerns the case and particularly issues of fact, the defendant is not required to show actual prejudice."), *with, e.g., Van Dyke,* 27 A.3d at 1123 ("Despite the fact that Rule 43 is rooted in a defendant's due process right to be present ... 'a violation of Rule 43 may in some circumstances be harmless error.'" (quoting *United States v. Toliver,* 330 F.3d 607, 611 (3d Cir.2003))). *See also Rushen,* 464 U.S. at 117 n. 2, 104 S.Ct. 453 (noting that the right to counsel, "as with most constitutional rights, [is] subject to harmless error analysis ... unless the deprivation, by its very nature, cannot be harmless" (citations omitted)); *United States v. Widgery,* 778 F.2d 325, 329 (7th Cir.1985) ("Some deprivations of the right to counsel are in this category [of *per se* reversible error].... The right to see a note from the jurors and comment on the response is not." (citing *Rushen, supra* )).

*United States,* 429 A.2d 519, 528 (D.C. 1981). We conclude that Mr. Euceda has sufficiently developed this claim, that the undisputed fact of the trial court's ex parte communication with the jury was error, and that this error is subject to harmless error analysis. *Accord Rushen,* 464 U.S. at 117–18 & 117 n. 2, 104 S.Ct. 453.

■ Regarding which standard of harmlessness to apply, we conclude that the error here is constitutional in nature and the proper harmless error review is the one stated in *Chapman:* "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24, 87 S.Ct. 824.

This court recently held that an ex parte communication between a judge and jury during deliberations was error, but not of constitutional dimension. *Van Dyke,* 27 A.3d at 1123, 1125–26. In *Van Dyke,* this court agreed, without discussion, with the government's assertion that in cases involving ex parte communications "we variously have applied the standard of harmlessness as articulated both in *Kotteakos* ... and in *Chapman.*" *Id.* at 1125 & n. 13. *Van Dyke* did not, however, identify an ex parte communication case, besides itself, in which we have applied the *Kotteakos* standard, and the government has not pointed us to any.[18] The jury in *Van Dyke* sent a second note proclaiming it was deadlocked, after the government and defense counsel already had argued about the proper response to repeated deadlock notes. *Id.* at 1118–19. When the new note arrived, the judge reconvened court, but after waiting twenty-five minutes for the parties to show up grew impatient and gave the instruction he had already told counsel he planned to give in the event of another deadlock note. *Id.* at 1120. The parties later were informed of the court's response and given a chance to object. We ruled that the judge's ex parte response was error but applied the *Kotteakos* standard because we could not "say that at the time the trial court received the second deadlock note from the jury ... 'the presence of [Mr. Van Dyke was] a condition of due process to the extent that a fair and just hearing would [have] be[en] thwarted by his absence.'" 27 A.3d at 1125–26 (quoting *Gagnon,* 470 U.S. at 526–27, 105 S.Ct. 1482).

This type of case, however, is unlike *Van Dyke,* where the defendant and counsel had been given a chance to address a potential response but were not present when the response was given and were later given a chance to object. And it is unlike *Hallmon v. United States,* 722 A.2d 26 (D.C.1998), where a clerk writing "for" the judge responded in writing to a routine, procedural request from jurors for a copy of their instructions. The kind of mishandling of a substantive jury note at issue here—where the note failed to even make it to the attention of a judge, the defendant, or his counsel—represents a breakdown of all the constitutional protections required during the "crucial stage of ... jury instructions."[19] *Workcuff,* 422

---

18. In *Hallmon,* we left open the question whether violations of Rule 43—in particular "non-substantive" violations—are subject to harmlessness analysis under *Kotteakos* or *Chapman.* 722 A.2d at 28. There, we found the clerk's ex parte response to "a procedural matter which would not have affected the jury's deliberations" to be harmless error under any standard. *Id.*

19. Despite the government's contention that "it is unclear whether an error in this regard is of constitutional dimension," and notwithstanding *Van Dyke's* passing reference to prior cases, it would be a rare case in which an ex parte communication concerning a substantive jury note left unaddressed by counsel would properly be defined as nonconstitutional error. Indeed, such an application of the

F.2d at 702. A "fair and just hearing" thus was "thwarted by" Mr. Euceda's absence, *Van Dyke,* 27 A.3d at 1125–26, and so the *Chapman* standard governs.[20]

Because we hold that the record here demonstrates a clear violation of Mr. Euceda's constitutional rights, the only question left is whether the error was harmless beyond a reasonable doubt. The government argues that this error was harmless under any standard because the response given to the jurors' questions—that their previous instructions were sufficient—"was substantively correct and appellant suffered no prejudice." The government contends that the answers to both of the note's questions were contained within the previous instructions. Mr. Euceda addresses this argument in his claim that the instruction was erroneous: At a time the jury had expressed specific difficulties in deliberations, the court failed to "clear them away with concrete accuracy." *Alcindore v. United States,* 818 A.2d 152, 155 (D.C.2003) (quoting *Bollenbach,* 326 U.S. at 612–13, 66 S.Ct. 402). Mr. Euceda argues that the previous instructions did not contain adequate answers to the jury's questions, and thus the response providing them with no new information on these questions failed to alleviate their confusion.

■ We agree with Mr. Euceda. Telling jurors to refer back to their original charge may be appropriate in some circumstances. *See United States v. Beckman,* 222 F.3d 512, 521 (8th Cir.2000); *but see Alcindore,* 818 A.2d at 155–58 (holding that judge's refusal to reinstruct jury after note demonstrated apparent confusion about law of self-defense was prejudicial error, even though "the trial court [had] properly instructed the jury" on self-defense). In this case, however, such a nonresponsive instruction did not come close to clearing away the jurors' confusion with "concrete accuracy." *Alcindore,* 818 A.2d at 155. To begin with, the determination whether to reinstruct a jury is committed to the discretion of the trial judge, *id.,* not the judge's clerk, so we are in some ways less concerned about whether a judge reasonably could have given the response at issue here than about the absence of any discretionary decision by a judge. In any event, this case is different from cases like *Beckman,* where the jury requested a supplemental instruction on whether someone could be convicted of conspiracy to distribute drugs merely by receiving the distributed drugs. 222 F.3d at 521. The Eighth Circuit there held that it was not an abuse of discretion to refer jurors back to their previous instructions where the court's initial instructions "accurately and thoroughly provided the elements and definitions of the crimes charged." *Id.*

Here, no one clear source for the answers was contained within the trial court's previous instructions. Rather than

---

*Kotteakos* standard appears to be rare even among our cases involving relatively straightforward ex parte responses to routine jury notes during the crucial stage of deliberation. *See, e.g., Allen v. United States,* 649 A.2d 548, 556–57 (D.C.1994); *Winestock,* 429 A.2d at 529.

**20.** Because of the focus of Mr. Euceda's claims, and because we reverse on his right-to-presence claim, we do not have occasion to address any further ramifications of the fact that the note appears to have been answered by a clerk. This fact does, however, reinforce our conclusion that Mr. Euceda's constitutional rights were violated. *See Gomez v. United States,* 490 U.S. 858, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) (holding that a magistrate, rather than a judge, presiding over voir dire was structural error because "[e]qually basic [to the right to an impartial adjudicator] is a defendant's right to have all critical stages of a criminal trial conducted by a person with jurisdiction to preside.").

informing the jurors specifically how the elements of attempted armed robbery interacted with the indictment's allegations, the previous instructions made vague references to the charges "relating" to Mr. Kirkland and Mr. Abbott. There was, moreover, no original instruction addressing the jurors' second question, about "previous interaction[s]." [21] At best, the jury may have been able to deduce the answers by assembling various premises scattered through the court's instructions and references to the indictment, but any reinstruction requiring a meandering search by a confused jury is not the concrete, accurate guidance required of trial courts. *See United States v. Nunez*, 889 F.2d 1564, 1568 (6th Cir.1989) ("When a jury indicates confusion about an important legal issue, it is not sufficient for the court to rely on more general statements in its prior charge. 'A conviction ought not to rest on an equivocal direction to the jury on a basic issue.'" (quoting *Bollenbach*, 326 U.S. at 613, 66 S.Ct. 402)).

It is clear from the jurors' note that they were confused about a substantive issue of law. They were trying to find the "act or acts" that satisfied the first element of attempted armed robbery (that "the defendant committed an act that was reasonably designed to commit the crime of robbery"). Yet they were unsure which acts legally could count. The government's trial witnesses testified about a series of acts performed by Mr. Euceda and Mr. Gallow throughout the night Mr. Kirkland was killed, some acts against Mr. Kirkland and Mr. Abbott and some against a "more general class of possible targets"; some performed in the same interaction in which Mr. Kirkland was shot and some during "previous interaction[s] that evening." Mr. Gallow was the only witness who testified about previous interactions or actions concerning anyone other than Mr. Kirkland or Mr. Abbott. Mr. Abbott, meanwhile, only testified about the final interaction, where Mr. Kirkland was shot, saying nothing about a "more general class of possible targets."

■ The jurors' note suggests they were having trouble gleaning the act requirement from witnesses' testimony about the final interaction in which Mr. Kirkland was shot and were willing to consider other acts. This strongly implies they were not eager to credit Deandre Abbott's confusing and contradictory testimony.[22] If

**21.** While the government primarily contends that the supplemental instruction was correct, it makes a secondary harmlessness argument that the most direct answer to the second question would have told the jury that yes, it could consider the earlier incidents, which were relevant in deciding whether Mr. Euceda intended to rob Mr. Kirkland and Mr. Abbott. Thus in the government's view, a more direct answer to this question "would hardly have inured to appellant's benefit." To begin with, this argument is unpersuasive, as the jurors' questions explicitly concerned which of Mr. Euceda's acts that evening could legally satisfy the act element, not the intent element. And just as it would not have been correct to answer the first question by telling jurors they could, when determining whether the government proved the act element of attempted armed robbery, consider Mr. Euce-

da's actions directed toward people other than Mr. Kirkland and Mr. Abbott, it would not have been correct to tell jurors in response to the second question merely that they could consider "any previous interaction that evening." Something more was needed, as these two questions taken together demonstrated substantial juror confusion and presented the possibility that jurors would convict Mr. Euceda for attempted robbery based on an unindicted attempt to rob another drug dealer earlier in the night.

**22.** While the note indicates jurors were inclined not to believe Mr. Abbott's testimony, we cannot agree with Mr. Euceda's claim that the evidence at trial was insufficient to convict him. Viewing the evidence in the light most favorable to the government, we conclude that Mr. Abbott's testimony was not so

they had, they likely would have had little trouble finding an act "reasonably designed to commit" robbery, such as Mr. Gallow's asking what was in Mr. Abbott's pocket after taking drugs from him, followed by his reaching for Mr. Abbott's pocket. The jury apparently wanted to know whether acts earlier in the night against targets other than Mr. Kirkland and Mr. Abbott could satisfy the act element of attempted armed robbery. The only references to such acts at trial were in Mr. Gallow's testimony about their interactions with the other drug dealer whom he said they definitely intended to rob.

These are not acts that could have satisfied the act element because the indictment alleged that Mr. Euceda "did attempt ... to steal and take money, from ... Walter Kirkland ... [and] Deandre Abbott," *not* some other drug dealer. *See Zacarias v. United States*, 884 A.2d 83, 86 (D.C.2005) ("A defendant cannot 'be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him.'" (quoting *Russell v. United States*, 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962))). A proper response from the court would have made this clear, due to the obvious danger that the jury wanted to rely upon Mr. Euceda's acts unrelated to Mr. Kirkland and Mr. Abbott when convicting him of attempted robbery. Effective defense counsel, given a chance to read the note and address the proper response, would

have argued against telling the jury to refer to its previous instructions and would have argued for an instruction clarifying that the jury could not satisfy the act element with Mr. Euceda's actions toward the other dealer.

Crucially here, the trial court's failure to properly address the jury's questions had implications for the attempted armed robbery charge as well as the felony murder charge, which required the jury to find that Mr. Euceda killed Mr. Kirkland *while attempting to rob him. See Johnson v. United States*, 671 A.2d 428, 433 (D.C. 1995) ("It must appear that there was such actual legal relation between the killing and the [underlying felony] ... that the killing can be said to have occurred *as a part of the perpetration of the crime.*" (emphasis in original) (internal quotation marks omitted)). This error also necessarily affected deliberations on the two counts of PFCV, which depended on findings of attempted armed robbery and felony murder. Considering the substantial confusion surrounding such a fundamental issue pertaining to Mr. Euceda's guilt of the most serious charges against him, and considering the inexplicable mishandling of the note and inadequate response during the critical deliberations stage, the violation of Mr. Euceda's right to be present and to be informed of jury notes was not harmless beyond a reasonable doubt, and his convictions on all counts except for CPWL must be reversed.[23]

inherently incredible that reasonable jurors could not have convicted Mr. Euceda beyond a reasonable doubt on each charge, *see Driver v. United States*, 521 A.2d 254, 259 (D.C. 1987), based on the following evidence: Mr. Abbott's photo identification of Mr. Euceda as the shooter and partner of Mr. Gallow and his testimony concerning Mr. Gallow's reach for his pocket and question about what Mr. Abbott had on him; Mr. Gallow's testimony that "Omar" went with him, armed, to rob drug

dealers and accompanied him when he interacted with Mr. Kirkland and Mr. Abbott, whom he identified as drug dealers; and Mr. Gallow's photo identification of Mr. Euceda as his accomplice and admission under oath that he and Mr. Euceda attempted to rob Mr. Kirkland and Mr. Abbott.

23. The government contended at oral argument that "the jury was obviously not confused" and in its brief similarly characterized the meager response to the jury's note as

## C. Appellant's CPWL Conviction Is Affirmed.

Though, as Mr. Euceda notes in his brief, the erroneous handling of the sixth jury note did not prejudice his CPWL conviction, two of his remaining claims involve errors that arguably did. We address each claim briefly and affirm his conviction on this charge.

Mr. Euceda claims his due process rights were violated through the cumulative effect of various errors regarding the admission of impeachment evidence, combined with a prosecutor's improper references to some of this evidence during closing argument. He specifically argues that the trial court should not have admitted evidence of Ivan Gallow's guilty plea, which implicated Mr. Euceda, without a cautionary instruction to the jury that the plea should not be considered as evidence of Mr. Euceda's guilt but only as evidence impeaching Mr. Gallow's credibility. He also argues that the trial court erred when instructing the jury how to consider witnesses' prior inconsistent statements: (1) by failing to differentiate between past statements Deandre Abbott made while not under oath and any he may have adopted in his sworn testimony by agreeing with them while under oath (namely his prior statement to police that the tall man—that is, not Mr. Euceda—was the shooter); and (2) by overstating the evidentiary value of prior sworn testimony as being "*proof* that what was said . . . earlier . . . was true" instead of merely substantive evidence of the truth of the statement. Finally, Mr. Euceda argues the trial court erred in not *sua sponte* prohibiting a prosecutor's remarks during closing that the jury could "consider as being the truth" Mr. Gallow's sworn plea testimony, a transcript of which was submitted to the jury.

We review all of these claims and their cumulative effect for plain error because Mr. Euceda's trial counsel did not object in any of these matters. *Otts v. United States*, 952 A.2d 156, 161 (D.C. 2007) (under plain error standard, appellant must show "(1) error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings" (citing *United States v. Olano*, 507 U.S. 725, 732–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993))).

Even if we assume that each part of this cumulative claim was error, we cannot conclude that any error substantially prejudiced Mr. Euceda or constituted a miscarriage of justice. The primary effect, if any, of all of these alleged errors would have been on jurors' identification of Mr. Euceda as the man who went armed with Mr. Gallow the night Walter Kirkland was killed and wielded the gun Mr. Abbott saw. But Mr. Gallow's sworn testimony while pleading guilty was a small part of the evidence that Mr. Euceda was the man named Omar who accompanied Mr. Gallow that night: jurors also had Mr. Abbott's identification of Mr. Euceda and Mr. Gallow's identification of the photo of Omar, which was confirmed to be a photo of Mr. Euceda. The guilty plea evidence was never accompanied by the argument that because Mr. Gallow pleaded guilty, Mr. Euceda must be guilty, too; the focus of the government's argument in closing was

"substantively correct" or "appropriate." We see this case differently. Given the depth of the jury's confusion about such a crucial issue, although we hold that the error here was of constitutional stature, we likewise are not fairly assured, even under the less demanding standard for demonstrating harmlessness in the context of nonconstitutional error, that the jury's verdict was not substantially swayed by the error. *See Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239.

that Mr. Gallow's actual sworn statements during the plea colloquy—which were, as such, admissible as substantive evidence—indicated that he and Mr. Euceda intended to rob Mr. Kirkland and Mr. Abbott. The jury was fully capable of sorting out these two witnesses' testimony, deciding which prior statements were admissible for their truth, and applying that testimony in the context of all the evidence admitted against Mr. Euceda.

Mr. Euceda also claims that the trial court violated his confrontation right in admitting the testimony of the District of Columbia Chief Medical Examiner Marie–Lydie Pierre–Louis, who did not perform the autopsy of Mr. Kirkland but based her testimony on a report by the medical examiner who did. Dr. Pierre–Louis testified that she reviewed the report of the examining doctor, Dr. Gertrude Juste. The court admitted Dr. Pierre–Louis's testimony as well as Dr. Juste's report—with a diagram, notes, and toxicology report attached—without objection by Mr. Euceda's trial counsel. Dr. Pierre–Louis testified that a bullet was recovered from Mr. Kirkland's body and given to an MPD officer; "[u]sually, we have a police officer present at the autopsy to recover evidence," she said. She said her opinion was that Mr. Kirkland died of "a gunshot wound to the torso with perforations of lungs and the aorta."

■■■ The Confrontation Clause of the Sixth Amendment does not allow admission of "testimonial" statements made by a witness out of court unless the declarant appears at trial or unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington,* 541 U.S. 36, 54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Because Mr. Euceda's counsel failed to object to the admission of Dr. Juste's autopsy report or Dr. Pierre–Louis's testimo-

ny concerning it, we review his claim for plain error. *Otts,* 952 A.2d at 161.

■■■ We cannot say that any error here was plain, as neither this court nor the Supreme Court has decided whether autopsy reports constitute the kind of "testimonial" statement subject to the Confrontation Clause. *See Mungo v. United States,* 987 A.2d 1145, 1153–54 (D.C.2010) (assuming without deciding that autopsy notes, "which were admitted as substantive evidence without any limiting instruction, were testimonial and that the error in admitting them without [the declarant's] live testimony is (now) plain" after the Supreme Court's decision in *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009)); *see also Melendez–Diaz,* 557 U.S. at 335, 360, 129 S.Ct. 2527 (Kennedy, J., dissenting) (in case holding that state laboratory analysts' certificates of analysis declaring tested substance was cocaine were testimonial statements, four dissenting justices warning that autopsy reports are among the "staggering" range of "other scientific tests that may be affected by the Court's new confrontation right"). Other courts, moreover, continue to be split on this question. *Compare, e.g., United States v. Mallay,* 712 F.3d 79, 99 (2d Cir.2013) (holding that autopsy report at issue, about which non-performing medical examiner testified at appellants' trial, was not testimonial "because it was not prepared primarily to create a record for use at a criminal trial"), *with United States v. Moore,* 651 F.3d 30, 69–74 (D.C.Cir.2011) (holding that autopsy reports were testimonial and thus inadmissible without appearance of medical examiners who performed the autopsies, where D.C. Office of the Medical Examiner is required by statute to investigate deaths at police request, where MPD homicide detectives and officers were present for

some autopsies, and where MPD participated in creating the reports).

We therefore reject Mr. Euceda's due process and Confrontation Clause claims. Because Mr. Euceda succeeds on neither of the two claims possibly affecting his conviction for CPWL, we affirm his conviction on this charge.

### III. Conclusion

Much was at stake for Mr. Euceda when the deliberating jury submitted a note demonstrating confusion over a basic issue vital to his guilt. This was no time for jurors to be left to their own devices, forced to search past instructions for answers that, even if there to be found, would have been far from obvious to them. But that is what happened, and it happened without the knowledge of the defendant or his counsel, thus violating Mr. Euceda's constitutional right to be present at trial and to be informed of all jury notes and given a chance to shape the court's response. This error was not harmless beyond a reasonable doubt, and we reverse Mr. Euceda's convictions on all charges but CPWL and remand for a new trial.[24]

---

24. We do not need to address Mr. Euceda's additional claims that (1) the trial court erred in refusing to instruct the jury on self-defense, and (2) convictions on two of the charges merge. These issues "will or will not materialize again, depending on the evidence as it develops [and the verdict] on retrial," *Lee v. United States*, 959 A.2d 1141, 1145 n. 6 (D.C. 2008). We also reject Mr. Euceda's final claim that the evidence at trial was insufficient to convict him. *See* note 22, *supra.*