*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-307

ORLANDO ROBERTS, APPELLANT

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-12916-14)

(Hon. Jennifer M. Anderson, Trial Judge)

(Argued April 6, 2017                    Decided August 8, 2019)

*Daniel Gonen*, Public Defender Service, with whom *Samia Fam* and *Alice Wang*, Public Defender Service, were on the brief, for Mr. Roberts.

*Danielle M. Kudla*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time, *Elizabeth Trosman*, *Andrea Hertzfeld*, and *Jason Park*, Assistant United States Attorneys, were on the brief, for the United States.

Before BECKWITH and EASTERLY, *Associate Judges*, and STEADMAN, *Senior Judge*.

EASTERLY, *Associate Judge*:  After a jury trial, Orlando Roberts was convicted of six counts of First Degree Child Sexual Abuse.[1]  He raises two challenges to his convictions on appeal.  First, Mr. Roberts argues that the trial court committed numerous errors in its handling of the notes sent by the jury during deliberations, including the court's failure to permit the defense to read one of the notes.  Second, Mr. Roberts argues his constitutional right to a public trial was violated by the court's voir dire procedure.  We need not address all of the subparts of the first argument, nor any of the second,[2] because we agree with Mr. Roberts that the trial court violated his constitutional rights by precluding the defense from reading one of the jury notes and that this error was not harmless beyond a reasonable doubt.  Accordingly, we vacate his convictions.

## I.  Facts and Procedural History

We focus on the facts and procedural history pertinent to the issue on appeal.  The government's theory of the case was that Mr. Roberts had sex and engaged in other sexual acts with the then-fourteen-year-old complainant while she was at his

---

[1]  D.C. Code § 22-3008 (2012 Repl.).  Mr. Roberts was acquitted of one additional count of First Degree Child Sexual Abuse and one count of Obstruction of Justice, D.C. Code § 22-722(a)(6) (2012 Repl.).

[2]  This argument would seem to be foreclosed by *Blades v. United States*, 200 A.3d 230 (D.C. 2019).

house on her first date with his nineteen-year-old son.[3]  Although the government

called a number of other witnesses, the case turned entirely on the complainant's

and Mr. Roberts's son's testimony, which there was reason to question.  The

complainant and Mr. Roberts's son had connected on Instagram, seemingly with

the purpose of initiating a sexual relationship;[4] had both lied to each other about

their ages (the complainant said she was older and the son said he was younger);

and ultimately had given inconsistent accounts of the incident, both independently

over time and as compared with each other.  Indeed, the defense theory was that

their story was a fabrication, invented after others learned that the two had had sex,

to get them out of trouble—the complainant with her then-foster mother, and Mr.

Roberts' son with the law since the complainant was a minor.

The case was submitted to the jury on November 25, 2014, the day before

the Thanksgiving holiday.  Jury deliberations did not resume until December 1,

2014.  At the end of that second day of deliberations, the foreperson sent out a note

to the judge on behalf of the jury, which asked, in relevant part, "What happens if

---

[3]  There is no biological or official legal relationship between Mr. Roberts and his son, but the characterization of their relationship as one between father and son was undisputed at trial.

[4]  The complainant testified that the son was known as a "fuck boy," which "means . . . what it sounds like."

there is a hu[n]g jury?"  Because of the timing, the trial court and the parties did not address the note until the following morning, December 2, 2014.  In the midst of their discussion of the first jury note, they received a second note—this time from a single juror.  It read:  "Because I take Jury Duties so serious, I seem to be one of three stand outs. I don't see how I can have a change of heart because the only information I have to rely on is my notes and the testimonies."[5]

The trial court read "the first line" of the note,[6] but, realizing that it contained a numerical breakdown of how the jury was voting, then stopped out of concern that the juror "might have been talking about [the jury's] deliberations." The trial court immediately asked the courtroom clerk to take the note to another Superior Court judge to screen it to determine if it was appropriate for the trial court to read.  The defense objected to this procedure, arguing that Mr. Roberts "has a right to know [what the note says] and have counsel review it," particularly "if there is some indication that there's an impasse or that the jury's at a deadlock." The trial court disagreed, explaining that neither the court nor the parties were

---

[5] The note was placed in the record under seal and is now part of the record before us.

[6] As written, the text of the first line is:  "Because I take Jury Duties."  But the court later indicated that it had seen "what looked like a number," which suggests that it may have seen more or all of the first sentence.

"entitled to see that note because we're not supposed to know anything about the[] [jury's] deliberations."

Proceedings, which had been briefly suspended, resumed after the trial court heard back from the screening judge. The trial court informed counsel that the screening judge had notified the court that "the note d[id] reflect a numerical breakdown." The trial court then proposed that it would (1) instruct the jury that it had not read the note and that it did not know "what is in the note," and (2) remind the jury not to disclose "the subject matter of your deliberations," and "reread the instruction on contact with the [c]ourt."[7]

Defense counsel again objected, arguing that "if" the jury was revealing a deadlock, the court and counsel needed to know. The court disagreed, reiterating that it had not read the entire note; that "we're not entitled to get into their deliberations"; and that "we don't know what's in the note." Counsel responded, "we need to know," and further that "[i]f there's a deadlock, the [c]ourt needs to know and has a duty to address that."

---

[7] *See* Criminal Jury Instructions for the District of Columbia, No. 2.509 (5th ed. 2014) ("Communications Between Court and Jury During Jury's Deliberations").

Defense counsel proposed a number of methods to obtain further information about a possible deadlock without exposing the court to information about a numerical split, including redacting the note, asking the screening judge to provide more information about the note's contents, and instructing the jury that if it was seeking to report a deadlock, it needed to do so without revealing a numerical split.[8] But the trial court was unpersuaded. The court appeared to take the position that, unless it knew there was a deadlock (which it could not because it had blinded itself to the note and had withheld it from counsel), it should not be concerned about a deadlock or engage in further inquiry to discern if the jury was deadlocked. The court first declared that "we haven't gotten . . . a note that said [the jury is] deadlocked" and then repeatedly stressed that "from our perspective, . . . we don't know what the note says."

---

[8] Counsel indicated that, if the note in fact reflected that the jury was deadlocked, he would request "either a mistrial or the Gallagher instruction." The "Gallagher instruction" refers to the anti-deadlock instruction proposed by Judge Gallagher in his concurrence to *Winters v. United States*, 317 A.2d 530 (D.C. 1974) (en banc); the jurors are directed, "do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or only for the purpose of returning a verdict." *Id.* at 539 (App'x to Concurring Opinion).

The trial court ultimately informed the jury that neither it nor counsel had "actually read the note," and that it had been screened by another judge who had advised them not to read it. The court then instructed the jury:

> I want to remind you of an instruction that I gave you at the beginning of deliberations. You should bear in mind that you're never, under any circumstances, to . . . reveal to any person, not the clerk, the marshal[,] or myself, how jurors are voting. This means that you should never tell me in writing or in open court how the jury is divided on any matters; for example, six to six, seven to five or eleven to one or in any other fashion, whether the vote is for conviction or acquittal or on any other issue on the case.
>
> So that note will be set aside. No one will read that. And with that in mind, you can redraft that note if you wish.

Later that day, defense counsel renewed his objection to the trial court's handling of the second jury note. Counsel asked the court to provide the jurors with additional instruction specifying that the court did not know the numerical split; they should not feel pressured "in one way or the other"; they should deliberate "freely and fairly"; and, if they were unable to reach a unanimous verdict, they should inform the court without revealing a numerical split. The court declined to give this instruction, again relying on the fact that "[w]e don't even know what the note is about." The court further reasoned that defense counsel was "extrapolating from a note that you have not read that you don't know

the contents [of and] which we're not entitled to[.] [Y]ou're extrapolating a whole host of things."

The jury deliberated for the rest of the day, and then, because of scheduling complications, did not resume until December 8, pushing deliberations into a third week. A little more than an hour after they recommenced deliberations, the jury informed the court that they had reached a verdict. The jury found Mr. Roberts guilty on six counts of First Degree Child Sexual Abuse.

## II. Withholding the Jury Note from the Defense

Mr. Roberts argues that his constitutional rights were violated when the trial court refused to allow the defense to review the jury note divulging their numerical division. He further asserts that his conviction must be reversed because the government cannot carry its burden, set forth in *Chapman v. California*, 386 U.S. 18 (1967), to establish that this constitutional error was harmless beyond a reasonable doubt. We agree.

As the government concedes, the trial court erred in withholding the jury's second note from defense counsel. "A defendant and his counsel have a right to be

informed of all communications from the jury and to offer their reactions before the trial judge undertakes to respond." *Smith v. United States*, 542 A.2d 823, 826 (D.C. 1988) (brackets omitted). In *Smith*, we identified Super. Ct. Crim. R. 43 as the "source of this right."[9] *Id.*; *accord Coley v. United States*, 196 A.3d 414, 424–25 (D.C. 2018). But we have since clarified that withholding a substantive jury note from the defense implicates a criminal defendant's constitutional rights to be present at every stage of his trial and to be represented by counsel. *Euceda v. United States*, 66 A.3d 994, 1005–06 (D.C. 2013) (explaining "the 'right to presence' is rooted in the Sixth Amendment's Confrontation Clause, as well as the Fifth Amendment's guarantee of due process, both of which require the defendant's presence, and the presence of counsel, to protect the defendant's rights at stages of the trial where 'a fair and just hearing would be thwarted by his absence'"); *Fortune v. United States*, 59 A.3d 949, 959 (D.C. 2013) (explaining that Rule 43(a) "incorporates the protections afforded by the Sixth Amendment Confrontation Clause, the Fifth Amendment Due Process Clause, and the common

---

[9] Superior Court Rule of Criminal Procedure 43 states that a "defendant must be present at . . . every trial stage, including jury impanelment and the return of the verdict." Super. Ct. Crim. R. 43(a)(2). It is nearly identical to Federal Rule of Criminal Procedure 43.

law right to presence").[10]    The trial court in this case, like the court in *Coley*, appears to have been acting from the best of motives, trying "to insulate [itself] from knowledge of the jury's numerical division" in the note indicating a deadlock. 196 A.3d at 424.  Nonetheless, "it was error"—constitutional error—"to insulate defense counsel [from this information] as well." *Id*.

The only question remaining is whether this error is harmless.  When an error "is constitutional in nature" and does not constitute structural error, "the proper harmless error review [standard] is the one stated in *Chapman*":   the government must establish that the error is harmless beyond a reasonable doubt. *Euceda*, 66 A.3d at 1007 (citing *Chapman*, 386 U.S. at 24).  Without explication, however, the government argues that it need only make the lesser showing of harm for nonconstitutional error set forth in *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946).  The sole case the government cites in support of this proposition is *Van Dyke v. United States*, 27 A.3d 1114 (D.C. 2011).  Although we applied the *Kotteakos* standard for harmlessness in *Van Dyke*, we did so based only "[o]n the

---

[10]   *Cf. United States v. Cronic*, 466 U.S. 648, 656 (1984) (explaining that formal appointment of counsel is insufficient to fulfill the Sixth Amendment guarantee; "the adversarial process protected by the Sixth Amendment requires that the accused have counsel *acting* in the role of an advocate" (emphasis added) (internal quotation marks omitted)).

record in th[at] case," which did not reflect a constitutional violation because, inter alia, defense counsel was ultimately informed and given an opportunity to be heard about the jury note in question.[11]  *Id.* at 1125.  By contrast, where, as here, the substantive content of a jury note has been entirely withheld from the defense, we have never applied the *Kotteakos* test for nonconstitutional errors; instead, whenever we have specified the test we are applying, we have applied the *Chapman* test for constitutional errors.  *See, e.g.*, *Euceda*, 66 A.3d at 1007; *Winestock v. United States*, 429 A.2d 519, 529 (D.C. 1981).

---

[11]  As we detailed in *Euceda*, the court and counsel had already received one deadlock note in *Van Dyke* and, correctly anticipating a second, had discussed how to respond to it.  When the second note came, the judge

> reconvened court, but after waiting twenty-five minutes for the parties to show up grew impatient and gave the instruction he had already told counsel he planned to give in the event of another deadlock note.  [*Van Dyke*, 27 A.3d] at 1120.  The parties later were informed of the court's response and given a chance to object.  We ruled that the judge's ex parte response was error but applied the *Kotteakos* standard because we could not "say that at the time the trial court received the second deadlock note from the jury . . . 'the presence of [Mr. Van Dyke was] a condition of due process to the extent that a fair and just hearing would [have] be[en] thwarted by his absence.'"

66 A.3d at 1007 (quoting *Van Dyke* 27 A.3d at 1125–26 (quoting *United States v. Gagnon*, 470 U.S. 522, 526–27 (1985))).

The government argues that, even if *Chapman* applies, it has carried its burden to show that the error in this case was harmless beyond a reasonable doubt. Specifically, it argues that "defense counsel was afforded ample opportunity to argue how the court should respond to the jury notes, . . . was aware that the undisclosed note revealed a numerical split, and there is no evidence that [defense counsel's] arguments would have changed if he had been aware of the precise numerical split." But we cannot reasonably assume, as the government appears to, that, had defense counsel had actual knowledge of the contents of the note, nothing would have changed—not defense counsel's arguments, the court's response, or the outcome in this close case.

It is generally true that the trial court must communicate with the jury with precision and care during deliberations, *see Bollenbach v. United States*, 326 U.S. 607, 612 (acknowledging that, "in a criminal trial, the judge's last word is apt to be the decisive word"); it is especially true when there is concern about potential deadlock and jury coercion. *See Coley*, 196 A.3d at 421 ("The greater the inherent coercive potential in the situation, the greater the need for the trial judge to take effective measures to dispel the risk of coercion."). For his part, counsel has a critical role to play in advocating for a response to a jury note that is most favorable to his client. *Id*. at 425 (explaining that keeping defense counsel in the

dark about the note's contents "impaired his ability to argue effectively for a[n] [anti-coercion] instruction to alleviate the coercive pressure" on the dissenting juror).

Counsel was clearly hamstrung in his ability to fulfill that role in this case. His intuition may have been correct, but he was still flying blind. Had counsel actually been permitted to read the note, he would have known that it indicated that the author did not "see how [she] could have a change of heart" and that she perceived herself to be one of a number of "standouts." Undoubtedly, he would have relayed the contents of the note (excepting the numerical division) to the court and cited the juror's statements as proof that the jury—who had been deliberating over the course of weeks and had already asked "what happens if there is a hung jury"—was in fact deadlocked. Counsel then could have argued with authority that a mistrial was now required, or at the very least that the jury be instructed that they "not surrender their honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or only for the purpose of returning a verdict." See note 8 *supra*. Equally important, there is at least a "reasonable possibility" that the trial court would have been moved by these arguments and proceeded differently. *See Chapman*, 386 U.S. at 24 (equating "reasonable possibility" and the government's burden to prove beyond a

reasonable doubt that the constitutional error did not contribute to the conviction). Repeatedly, the court used the fact that defense counsel was arguing from a position of (court-imposed) ignorance as a basis to disregard counsel's arguments, rejecting his concerns because "we don't know what the note says." Had defense counsel actually been permitted to read the note and to inform the court of its contents (minus the numerical split), the court could not have dismissed counsel's concerns in this way, and there is a reasonable possibility that it would have opted to respond to the jury's note in a manner that addressed the (substantiated) likelihood of deadlock.

Under *Chapman*, we must be able to conclude beyond a reasonable doubt that there was no harm to Mr. Roberts from the court's ruling. If there is a "reasonable possibility" that the trial court's ruling withholding the jury's note from defense counsel harmed Mr. Roberts, we cannot affirm. *Chapman*, 386 U.S. at 24. We conclude that there was such a possibility under the circumstances of this case.

### III.    Conclusion

Because the trial court's error in withholding the jury note from defense counsel was not harmless beyond a reasonable doubt, we reverse his convictions

and remand this case to the trial court for further proceedings consistent with this opinion.

*So ordered.*