**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 55665-1-II |
| Respondent, | |
| v. | |
| ROBERT JEROME SMITH, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — Robert Smith appeals his judgment and sentence. Smith was convicted of three counts of child rape following a jury trial. On appeal, he argues that (1) the trial court violated Smith's right to counsel when it refused to reveal the entirety of the jury's note to the parties, (2) his sentencing counsel had a conflict of interest, and (3) the trial court erred when it failed to inquire about the conflict of interest.

Smith further argues, and the State concedes, that (4) the trial court erred by imposing improper and unconstitutional community custody conditions. Regarding legal financial obligations (LFOs), Smith argues that (5) the judgment and sentence includes discretionary fees despite the trial court's intention to waive all discretionary fees. Smith also makes several arguments alleging his counsel was ineffective.

Lastly, in his statement of additional grounds (SAG), Smith argues that trial counsel denied him the opportunity to testify, and the professionals who testified on behalf of VR were coercive.

We hold that (1) Smith cannot raise for the first time on appeal the argument that the trial court erred when it failed to share the entirety of the jury's note because the error is not manifest. We also hold that (2) sentencing counsel had a conflict of interest, and (3) the trial court erred when it failed to inquire into the conflict, requiring us to remand this case for a mistrial motion with conflict-free counsel. We further hold that (4) the trial court erred by imposing improper and unconstitutional community custody conditions, and the conditions must be modified in accordance with the law, and (5) the trial court intended to waive all discretionary fees. Because ineffective assistance of counsel is the subject of the motion for new trial, we do not address Smith's ineffective assistance of counsel arguments on appeal. We also do not address the arguments in Smith's SAG.

Therefore, we reverse in part and remand with instructions for the trial court to appoint conflict free counsel to prepare and argue a motion for new trial and, if the motion for new trial is denied, the trial court shall modify community custody conditions in accordance with Smith's constitutional rights.

## FACTS

### I. BACKGROUND

VR was six years old when she started living with her mother who was in a relationship with Smith. Smith was the father of VR's younger half-brother. VR and her mother lived in different places over several years, including an apartment they shared with Smith. After VR and her mother moved out of the apartment they shared with Smith, he would regularly visit VR. In 2019, when VR was 11 years old, she alleged that Smith touched and penetrated her private parts with his fingers at three different residences when she was between six and eight years old.

No. 55665-1-II

After VR brought these allegations, the State charged Smith with three counts of child rape in the first degree, and the matter proceeded to a jury trial.

## II. SMITH'S ABSENCE AND TRIAL EVIDENCE

Smith was present for jury selection but did not appear at trial. After the jury was selected, Smith sent a text message to his attorney informing him that he would not be present. The trial court determined that Smith's absence was voluntary and proceeded with the trial in his absence.

VR testified about three separate incidents where Smith sexually assaulted her. VR also testified that she did not disclose the incidents sooner because she was scared Smith would hurt her if she did. She said she had seen Smith hit her mother before.

## III. JURY NOTE AND VERDICT

A few hours after the jury began deliberating, it submitted a written inquiry to the trial court, stating

> We have a (1) juror who is not following the juror instructions by bringing in their opinions of how the process should be handled. The other 11 jurors have tried to explain and show the instructions clearly, but they have refused to listen and have started making personal attacks. The other 11 jurors have found the defendant guilty on all counts.

Clerk's Papers (CP) at 27. When informing the parties of the inquiry, the court explained:

> I have a document here, an inquiry from the jury, that has an inappropriate statement on it that I'm not intending to share with either side, and I do think it's appropriate that I redact a portion of this. However, by doing that, the other issue is not documented.
>
> So, one of the requirements of the jury instructions is that if there is an inquiry the inquiry should not include how the jury is currently voting towards any particular issue, and they have put that into the inquiry. But I think if we deal with the first issue we can deal with the other issue subsequently. So, is there any

3

objection from either the State or the defense for the Court to redact that portion of the inquiry that indicates how the jurors are currently thinking?

2 Report of Proceedings (RP) at 666. The State asked: "Is that what the Court considers inappropriate is the vote that was included or are we talking about something else?" 2 RP at 667. The trial court confirmed and clarified that "[t]he vote is included in the inquiry here." 2 RP at 667. Smith's trial counsel told the trial court that redacting the question was "fine," and did not ask any follow up questions. 2 RP at 668. The trial court read the inquiry to the parties but omitted the last sentence stating that "[t]he other 11 jurors have found the defendant guilty on all counts." CP at 27.

The trial court determined that the note raised an issue of potential juror misconduct, and the State urged the trial court to dismiss the juror, call an alternate juror, and restart deliberations. Smith's trial counsel agreed, commenting that "[i]t would be a waste of the past week if we just declared a hung jury or a mistrial and reset this. So, I think that if the Court finds that there's enough to dismiss that juror then the alternate should call – be called in." 2 RP at 669.

To determine whether dismissal was appropriate, the trial court questioned the presiding juror. The presiding juror explained that the recalcitrant juror was "unwilling to follow the juror instructions." 2 RP at 675. The presiding juror explained:

He wants additional evidence. He made some statements about the State not producing evidence that he would like to see in the trial. And because of that he didn't want to take the evidence of the victim at face value; he wanted evidence to corroborate her statement as opposed to receiving that as true evidence, on No. 6, direct evidence, was not interested in having that be direct evidence.

He also was against Instruction No. 7. We did a lot of referencing back to your instructions here, and Instruction No. 7 about the defendant not being required to testify, you may not use the fact that the defendant has not testified to infer guilt

or prejudice him in any way. He felt that the defendant should have testified and did not want to let that go.

And at the end of Instruction No. 1 he felt that because of past experience that he had with an employee, who he felt was wrongly accused of another crime, he felt like he didn't want to provide a decision because he was worried about what the punishment for the crime was going to be. We tried to help him understand that on Instruction No. 1, you may not consider the fact that punishment may follow conviction, except insofar as it may tend to make you careful.

2 RP at 675-76. The presiding juror stated that the recalcitrant juror was not treating VR's testimony as direct evidence because VR was "a little girl" who "could have said anything . . . for attention." 2 RP at 677. And, that the recalcitrant juror began to make "personal attacks" that included "swearing." 2 RP at 676-77.

The trial court concluded that the recalcitrant juror had not committed misconduct. The State and Smith's trial counsel ultimately agreed that the recalcitrant juror's comments reflected the juror's view of the weight of the evidence. The trial court provided a written response to the jury's inquiry, which stated the following:

The jurors are reminded that they are directed to follow the instructions of the court as set forth in all of the jury instructions. This includes instructions #1, 6 and 7.[1] By saying this, the court is not indicating that these instructions are any more important than the other instructions.

---

[1] Jury Instruction No. 1 was the entirety of WPIC 1.02, including most of the bracketed material, and included instructions to "decide the facts in this case based upon the evidence presented to you during this trial" and "to accept the law from [the] instructions, regardless of what you personally believe the law is or what you personally think it should be." CP at 10. It also states, in part, that the jury may not consider "the fact that punishment may follow conviction except insofar as it may tend to make you careful." CP at 12. Jury Instruction No. 6 was WPIC 5.01 that described direct and circumstantial evidence. And, Jury Instruction No. 7 was WPIC 6.31 that explained that the defendant is not required to testify.

No. 55665-1-II

CP at 27. The trial court did not reference instruction number 2.[2] Neither party objected to the

written response. Less than an hour after being instructed, the jury returned a guilty verdict on

all three counts.

IV. NEW COUNSEL AND MOTION FOR A NEW TRIAL

After the trial, trial counsel filed a motion to appoint Smith a different attorney for

sentencing. Counsel explained that Smith refused to communicate with him but did not disclose

why. The trial court granted the request.

The trial court appointed Peter Jones as counsel to represent Smith at sentencing. Jones

was the director of the Mason County Public Defender's Officer, making him trial counsel,

Ronald Sergi's, "boss." 2 RP at 721, 698. In addressing the possibility of a conflict of interest,

Jones explained that he "essentially instructed [sic] a wall"[3] between himself and Sergi. 2 RP at

720. Jones stated:

> I don't talk to him about the case. I haven't—other than to say, I'm not going to
> talk to you about the case . . . I'm not going to be instructing him one way [or] the
> other, because I think that's the best way we can avoid a conflict of interest is to
> simply erect that barrier between Mr. Sergi and myself for purposes of this case.

2 RP at 720-21.

Jones filed a motion for new trial under CrR 7.5(a)(5) and (a)(8), alleging that Sergi

provided ineffective assistance of counsel by failing to communicate to Smith that he had a

---

[2] Jury Instruction No. 2, which was WPIC 1.04, explained that a juror should not surrender their honest belief about the value or significance of evidence solely because of the opinions of their fellow jurors.

[3] We assume Jones meant "constructed a wall."

6

constitutional right to testify in his own defense at trial.[4]  Smith explained that he wanted to testify, but he "misunderstood the process" because he was under an impression that he could not testify.  RP at 697.  Jones argued:

> the issue here is that Mr. Smith was, during the presentation of the State's case and during the voir dire sections and opening sections under the impression that because he was being told he couldn't speak directly as the State's case was going on, respond to any given thing the witness was saying. He was under the impression that he wasn't being given the opportunity to testify.

2 RP at 697.  Jones informed the trial court that Smith's decision to be absent was due to his misunderstanding that he could not testify.  In connection with the request for a new trial, Smith submitted a declaration, which stated that during conversations with his trial attorney, his right to testify was never addressed, but that Smith was "adamant about [his] desire to testify."  CP at 41.  He also stated that when he heard the court ask for a list of witnesses from both parties, and his name was not included, so he "believed that [he] was not going to be testifying during the trial" and trial counsel never addressed why Smith's name was not on the list.  CP at 41.  As a result of the misunderstanding, Smith stated that he fled for fear of his case deteriorating.

In response, the State introduced a document entitled "Declaration of Trial Counsel," which purported to be Sergi's statement saying

> I had every intention for Mr. Smith to testify if that was his intention. Mr. Smith would have been advised it is ultimately his decision. . . . I thought it would be in his best interest if he did testify. Especially since he had no impeachable prior convictions and it would have helped explain some of the factual issues to the jury. Mr. Smith really had nothing to lose in testifying.

---

[4] CrR 7.5(a) provides that a trial court may grant a new trial when it "appears that a substantial right of the defendant was materially affected."  Subsection (5) provides that one of the reasons may be an "[i]rregularity in the proceedings of the court, jury or prosecution, or any order of court, or abuse of discretion, by which the defendant was prevented from having a fair trial," and subsection (8) states "[t]hat substantial justice has not been done."

> I do not recall Mr. Smith asking about why the Judge did not recite Mr. Smith's name when the Court advised the jury of the potential witness. . . . Had I been aware of his concern I certainly would have addressed the issue with Mr. Smith. I agree with Mr. Smith's assessment that his case substantially deteriorated without his testimony.

CP at 101-102. For some unexplained reason, trial counsel's "declaration" was not signed under penalty of perjury. CP at 102.

The trial court denied Smith's motion for a new trial.

### V. SENTENCING, COMMUNITY CUSTODY CONDITIONS, AND LEGAL FINANCIAL OBLIGATIONS

The trial court sentenced Smith to concurrent standard range indeterminate sentences of 228 months to life on each of the rape convictions. The trial court also imposed an indeterminate term of community custody. The trial court found that Smith was indigent and unable "to meet his legal financial obligations." 2 RP at 756. Regarding Smith's financial obligations, the trial court stated the following:

> The Court is going to find that Mr. Smith does not have the ability to meet his legal financial obligations, will impose the $500 crime victims fund, which is the mandatory portion. The $200 filing fee, the $100 DNA fee will be waived given prior–total of $500 will be paid at the rate of not less than $25 a month commencing sixty days after the date of release.

RP at 756-57. Despite the trial court's statement that Smith's total LFO's would be $500, additional Department of Corrections (DOC) supervision fees were included in the judgment and sentence form. The trial court also imposed the following community custody conditions:

> (12) The defendant shall, at his/her own expense, submit to random urinalysis and/or breathalyzer testing at the request of the CCO or treatment provider to verify compliance.

> (13) The defendant shall not have contact with minor children under the age of 18 years of age unless in the presence of a responsible adult who is capable of

protecting the child and is aware of in the conviction, and contact has been approved advance by the CCO arid the Sexual Offender Treatment Provider. (SOTP).

(14) Have no contact with his victim, VR (DOB: 02/11/08) or any member of the victim's immediate family whether in person, through a third party, via mail (electronic or otherwise[)], or any other means.

. . . .

(18) The defendant shall not view or listen to pornographic materials of any kind, including, but not limited to: magazines containing depictions of nude persons, video of nude persons, depictions of individual(s) engaged in sexual behaviors, or other materials or depictions of nude persons, sexual behaviors between persons as determined/defined by the CCO and the Sexual Offender Treatment Provider (SOTP).

(19) The defendant shall not pursue intimate, romantic, or sexual relationships without prior authorization from the supervising CCO and sex offender treatment provider (SOTP).

(20) The defendant shall undergo and successfully pass, at public expense, periodic polygraph and/or plethysmograph testing to measure treatment progress and compliance at a frequency determined by his/her Sexual Offender Treatment Provider (SOTP), CCO, or DOC Policy.

CP at 61.

Smith appeals his convictions and sentence.

ANALYSIS

I. THE JURY NOTE

A.      *Manifest Constitutional Error*

For the first time on appeal, Smith argues that the trial court's refusal to disclose the entirety of the jury note deprived him of his constitutional right to counsel. The State argues that we should not consider this argument for the first time on appeal because the error is not manifest. We agree with the State.

Appellate courts may refuse to hear arguments raised for the first time on appeal, unless a violation is a "manifest error affecting a constitutional right." RAP 2.5(a), *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). An error is manifest if the appellant can show "'how the alleged error actually affected the [appellant]'s rights at trial.'" *O'Hara*, 167 Wn.2d at 98 (quoting *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007)). If the claim raises a manifest constitutional error, it may still be subject to a harmless error analysis. *O'Hara*, 167 Wn.2d at 98.

1. *Constitutional Error*

The Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to counsel at all critical stages of a criminal proceeding. *State v. Robinson*, 153 Wn.2d 689, 694, 107 P.3d 90 (2005). "A 'critical stage' in the right to counsel context is when 'a defendant's rights may be lost, defenses waived, privileges claimed or waived, or in which the outcome of the case is otherwise substantially affected.'" *State v. McCarthy*, 178 Wn. App. 90, 101, 312 P.3d 1027 (2013) (quoting *State v. Heddrick*, 166 Wn.2d 898, 910, 215 P.3d 201 (2009)). A substantive communication by the jury "'is a critical stage of the trial at which the defendant has a right to meaningful representation by counsel.'" *McCarthy*, 178 Wn. App. at 101 (quoting *State v. Koss*, 158 Wn. App. 8, 18, 241 P.3d 415 (2010)). The Sixth Amendment requires a court to consult trial counsel when it receives an inquiry from the jury. *United States v. Martinez*, 850 F.3d 1097, 1102 (9th Cir. 2017).

Whether Smith's right to counsel has been violated is a question of law we review de novo. *State v. Jones*, 168 Wn.2d 713, 719, 230 P.3d 576 (2010). When a trial court receives a

communication from the jury, it must disclose the communication to all parties. *State v. Bourgeois*, 133 Wn.2d 389, 407, 945 P.2d 1120 (1997). The trial court should provide the parties with an "opportunity to comment upon an appropriate response" to the jury's note. CrR 6.15 (f)(1). If a court fails to do so, a communication is improper and may amount to a constitutional error. *Bourgeois*, 133 Wn.2d at 407.

Here, the trial court received an inquiry from the jury, which included information about one recalcitrant juror that stated the following:

> We have a (1) juror who is not following the juror instructions by bringing in their opinions of how the process should be handled. The other 11 jurors have tried to explain and show the instructions clearly, but they have refused to listen and have started making personal attacks. The other 11 jurors have found the defendant guilty on all counts.

CP at 27. When the trial court questioned the presiding juror about the recalcitrant juror's reservations, the presiding juror explained that the juror "wants additional evidence," he did not believe that the victim was credible, and he wanted "evidence to corroborate [the victim's] statement." 2 RP at 675.

Here, the error implicated a constitutional interest. The case law is clear about substantive communications between the judge and the jury: any discussion regarding a substantive issue concerning the trial must be communicated to counsel. *McCarthy*, 178 Wn. App. at 101; *Martinez*, 850 F.3d at 1102. Failure to inform the parties of a jury inquiry is constitutional error. *Martinez*, 850 F.3d at 1102. As federal courts have held, "[a] defendant and his counsel have a right to be informed of all communications from the jury and to offer their reactions before the trial judge undertakes to respond." *Roberts v. United States*, 213 A.3d 593, 596 (D.C. 2019). Withholding a substantive jury note from a criminal defendant implicates a

11

defendant's constitutional rights to be present at every stage of his trial and to be represented by counsel. *Euceda v. United States*, 66 A.3d 994, 1005-06 (D.C. 2013).

Smith cites to *Roberts v. United States*, 213 A.3d 593, 596 (D.C. 2019) to support his argument that a trial court's refusal to reveal a jury inquiry containing the jury's vote violated his constitutional right to counsel. The present case is almost identical to *Roberts*.

In *Roberts*, the jury submitted a note to the court indicating the numerical split in the jury's vote, which stated "[b]ecause I take Jury Duties so serious, I seem to be one of three stand outs. I don't see how I can have a change of heart because the only information I have to rely on is my notes and the testimonies." *Roberts*, 213 A.3d at 594 (internal quotation marks omitted). The trial court read the first line of the note, but, realizing that it contained a numerical breakdown of how the jury was voting, it stopped out of concern that the juror "might have been talking about [the jury's] deliberations." *Roberts*, 213 A.3d at 594-95. The trial court sent the note to another judge who advised the trial court not to read it.

The trial court thereafter refused to read the inquiry in its entirety despite defense counsel objecting multiple times and urging the court to consider other methods to reveal whether the jury was deadlocked without revealing the numerical division, including "redacting the note, asking the screening judge to provide more information about the note's contents, and instructing the jury that if it was seeking to report a deadlock, it needed to do so without revealing a numerical split." *Roberts*, 213 A.3d at 595. The trial court was unpersuaded. *Roberts*, 213 A.3d at 595. The court of appeals held that the trial court violated the defendant's right to counsel by withholding the note's contents. *Roberts*, 213 A.3d at 596.

The holding in *Roberts* is in line with our precedent, and we follow its holding. *See Bourgeois*, 133 Wn.2d at 407 (a trial court must share all communications between the court and the jury with the parties); *McCarthy*, 178 Wn. App. at 101 (trial court must share all substantive jury communications with the parties). Thus, we hold that Smith met his burden of showing that the trial court committed constitutional error.[5]

2.      *Manifest Error*

For us to consider this argument for the first time on appeal, Smith must also show that the error was manifest. RAP 2.5(a). An error is manifest if an appellant can show actual prejudice. *Kirkman*, 159 Wn.2d at 935. To demonstrate actual prejudice, there must be a "plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case." *O'Hara*, 167 Wn.2d at 99 (internal quotation marks omitted). "In determining whether the error was identifiable, the trial record must be sufficient to determine the merits of the claim." *O'Hara*, 167 Wn.2d at 99. Therefore, "[i]f the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest." *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). And, if an error is practical and identifiable, the appellate court must put itself in the shoes of the trial court to ascertain whether, given what the trial court knew at the time of the alleged error, the court could have corrected the error. *O'Hara*, 167 Wn.2d at 100.

---

[5] Smith also argues that despite his counsel's physical presence, counsel was constructively absent. Because we hold that the trial court erred by failing to disclose the note's contents, we do not address this argument.

Here, the error is not manifest because Smith fails to show actual prejudice. Smith makes no argument that the error is manifest. He merely lists alternative arguments trial counsel could have made had he known about the jury vote, such as advocating for a favorable response to the inquiry or advocating for deadlocked jury and a new trial. This is not an affirmative showing of actual prejudice. *McFarland*, 127 Wn.2d at 334 ("It is not enough that the Defendant allege prejudice—actual prejudice must appear in the record."). Hypothesizing about possible prejudice, or alternative arguments that could have been made but were not, does not amount to actual prejudice, especially when Smith does not show that the trial court would have accepted any of Smith's arguments. *McFarland*, 127 Wn.2d at 334 (to show actual prejudice, defendants must show that the trial court would have granted their motion for a new trial).

Specifically, Smith argues that had he known about the numerical division, he could have advocated for a deadlocked jury and thus a new trial. This argument fails.

Smith bases his argument on an assumption that the jury was deadlocked. However, the jury deliberated for three hours before they sent the jury note informing the trial court about the numerical division. The note was not a declaration of deadlock. The note simply expressed the numerical division of the jury. Therefore, Smith has not shown that the error is practical and identifiable from the record.

Thus, Smith failed to show that the trial court committed manifest constitutional error, and we do not review Smith's argument being raised for the first time no appeal per RAP 2.5(a).

## II. SENTENCING COUNSEL'S CONFLICT OF INTEREST

Smith argues that he was denied his right to conflict free counsel, and the trial court erred by failing to inquire into a conflict of interest between sentencing counsel and trial counsel. We agree.

A.      *Conflict Free Counsel*

"The Sixth Amendment to the United States Constitution provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense.'" *State v. Dhaliwal*, 150 Wn.2d 559, 566, 79 P.3d 432 (2003) (alterations in original) (quoting U.S. CONST. amend. VI). "Effective assistance of counsel includes a duty of loyalty and a duty to avoid conflicts of interest." *State v. Kitt*, 9 Wn. App. 2d 235, 243, 442 P.3d 1280 (2019).

To establish a violation of the right to effective assistance of counsel based on conflict of interest, "'a defendant must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.'" *Kitt*, 9 Wn. App. 2d at 243 (quoting *State v. Regan*, 143 Wn. App. 419, 427, 177 P.3d 783 (2008)). In other words, a defendant must meet a two-prong test that (1) his attorney had a conflict of interest, and (2) the conflict adversely affected counsel's performance. *Kitt*, 9 Wn. App. 2d at 243.

"[R]eversal is always necessary where a defendant shows an actual conflict of interest adversely affecting his lawyer's performance." *State v. White*, 80 Wn. App. 406, 411, 907 P.2d 310 (1995) (quoting *In re Pers. Restraint of Richardson*, 100 Wn.2d 669, 677, 675 P.2d 209 (1983)). "To show that the conflict adversely affected his lawyer's performance, the defendant must show that the conflict either 'cause[d] some lapse in representation contrary to the

defendant's interests,' or 'likely affected particular aspects of counsel's advocacy on behalf of the defendant.'" *Kitt*, 9 Wn. App. 2d at 243 (alterations in original) (internal quotation marks omitted) (quoting *Regan*, 143 Wn. App. at 428). The mere possibility of a conflict is insufficient to warrant reversal. *Kitt*, 9 Wn. App. 2d at 243. However, the defendant successfully shows an adverse effect by presenting "'that some plausible alternative defense strategy or tactic might have been pursued' but was not and that 'the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" *Regan*, 143 Wn. App. at 428 (quoting *United States v. Stantini*, 85 F.3d 9, 16 (2d Cir.1996)). Whether a conflict exists is a question of law subject to de novo review. *Regan*, 143 Wn. App. at 428.

The Washington Rules of Professional Conduct (RPC's) recognize a conflict of interest when a lawyer's responsibilities to another client or third party are directly adverse or materially limit the lawyer's representation. RPC 1.7(a). RPC 1.7(a)(2) provides that a concurrent conflict of interest exists if

> there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

Here, sentencing counsel was trial counsel's "boss." 2 RP at 721. Sentencing counsel acknowledged and addressed the potential conflict by stating that he did not talk to trial counsel about this case and that he erected a barrier between him and trial counsel. Sentencing counsel also moved for a new trial based on ineffective assistance of counsel and Smith's absence. Specifically, sentencing counsel explained his basis for filing a motion for a new trial as follows:

> I hate saying this about an attorney who works for me, but [the motion for a new trial is] based on ineffective assistance because of that miscommunication and that

16

fundamental misunderstanding about what [Smith's] constitutional right was at trial.

2 RP at 698. Despite sentencing counsel basing a motion for a new trial on trial counsel's ineffective assistance, he failed to question trial counsel's representation or credibility—he did not call trial counsel to testify, cross-examine him, or question why his written declaration was not sworn under penalty of perjury. Moreover, instead of investigating trial counsel's performance, sentencing counsel said he "[co]nstructed a wall" between himself and trial counsel and did not talk to trial counsel about the case. 2 RP at 720.

The facts here are similar to those in *State v. O'Neil*, 198 Wn. App. 537, 540, 393, P.3d 1238 (2017), where O'Neil was first represented by an attorney from the King County Department of Public Defense, at the Defender Association Division. *O'Neil*, 198 Wn. App. at 541. O'Neil obtained new counsel from the same public defense office, but a different division. *O'Neil*, 198 Wn. App. at 541. With his new attorney, O'Neil moved for rearraignment based on ineffective assistance of counsel. *O'Neil*, 198 Wn. App. at 541. To evaluate the claim, the State moved to interview an employee whom O'Neil's new counsel supervised. *O'Neil*, 198 Wn. App. at 541. The court of appeals held that "a significant risk exists that representation of O'Neil would be materially affected by the personal interests of [his attorney]." *O'Neil*, 198 Wn. App. at 545. It further held that "[t]he personal interest at issue is not merely [the attorney's] relationship with [the employee], but how his own supervisory position undermines his advocacy for O'Neil, if [the employee] testifies for the State." *O'Neil*, 198 Wn. App. at 544.

Here, as in *O'Neil*, the supervising attorney was conflicted under RPC 1.7(a)(2). Sentencing counsel's duty to Smith was to question trial counsel's credibility and about his

possible deficient representation of Smith. On the other hand, sentencing counsel's natural inclination would be to defend the work of his employees and, in turn, his work as their supervisor. Because those two duties are in conflict, sentencing counsel was conflicted under RPC 1.7(a)(2), and sentencing counsel's position created a significant risk that his representation of Smith would be "materially limited by the [sentencing counsel's] responsibilities" to his employer and employees. RPC 1.7(a)(2).

Because Smith shows that a plausible defense tactic might have been pursued but was not, the conflict affected sentencing counsel's representation and judgment. *Kitt*, 9 Wn. App. 2d at 243. Therefore, sentencing counsel had a conflict of interest, and we presume prejudice. *Kitt*, 9 Wn. App. 2d at 243 (holding that a showing of conflict creates a presumption of prejudice).

B.      *Trial Court's Failure to Inquire into the Conflict*

Smith argues that the trial court erred by failing to inquire into the conflict of interest. We agree.

The trial court commits reversible error "if it 'knows or reasonably should know of a particular conflict into which it fails to inquire.'" *White*, 80 Wn. App. at 411 (quoting *Richardson*, 100 Wn.2d at 677). Here, the trial court knew of the potential conflict of interest due to the relationship between trial and sentencing counsel and the importance of questioning trial counsel about the scope of his representation, which directly affected sentencing counsel. Yet, the trial court failed to inquire further into the conflict.

Thus, the trial court knew or should have known about the potential conflict, and it committed reversible error by failing to inquire about the conflict. Smith is entitled to a new hearing on a motion for a new trial with conflict-free counsel.[6]

### III. COMMUNITY CUSTODY CONDITIONS AND FEES

A.      *Condition Ordering Plethysmograph Testing at the Direction of Community Custody Officer*

Smith argues that the condition ordering plethysmograph testing at the direction of the Community Custody Officer (CCO) or per DOC policy is unconstitutional and unauthorized by law. The State concedes this issue. We accept the State's concession.

Plethysmograph testing involves the restraint and monitoring of an intimate part of a person's body while the mind is exposed to pornographic material. *In re Marriage of Parker*, 91 Wn. App. 219, 222-24, 957 P.2d 256 (1998). "'It is a gauge for determining immediate sexual arousal level in response to various stimuli used as part of a treatment program for sex offenders.'" *State v. Johnson*, 184 Wn. App. 777, 780, 340 P.3d 230 (2014) (quoting *State v. Riles*, 135 Wn.2d 326, 345, 957 P.2d 655 (1998)).

A trial court may impose a condition requiring plethysmograph testing, but the condition must limit the testing to crime-related treatment purposes by a qualified treatment provider. *State v. Land*, 172 Wn. App. 593, 605, 295 P.3d 782 (2013). "'[A] sentencing court may not order plethysmograph testing unless it also requires crime-related treatment for sexual deviancy

---

[6] On remand, new counsel is not limited to the arguments made by Jones, but is free to investigate and argue a motion for new trial on any grounds.

. . . [Plethysmograph testing] is only useful, within the context of a comprehensive evaluation or treatment process.'" *Johnson*, 184 Wn. App. at 780 (alterations in original) (quoting *Riles*, 135 Wn.2d at 352).

We review constitutional challenges to a condition of community custody de novo. *State v. Wallmuller*, 194 Wn.2d 234, 238, 449 P.3d 619 (2019). A community custody condition may not permit plethysmograph testing "as a routine monitoring tool subject only to the discretion of a community corrections officer." *Land*, 172 Wn. App. at 605. Our Supreme Court recognized that plethysmograph testing, unlike polygraph testing, does not serve a monitoring purpose. *Johnson*, 184 Wn. App. at 781. And, a community custody officer's authority for ordering plethysmograph testing is limited to treatment. *Johnson*, 184 Wn. App. at 781.

The trial court imposed the following community custody condition at sentencing:

> (20) The defendant shall undergo and successfully pass, at public expense, periodic polygraph and/or plethysmograph testing to measure treatment progress and compliance at a frequency determined by his/her Sexual Offender Treatment Provider (SOTP), CCO, or DOC Policy.

CP at 61. The community custody condition permits Smith to be subjected to plethysmograph testing at the discretion of the CCO or other DOC employees, which violates the law because it leaves open the possibility that Smith would be subjected to testing for reasons unrelated to treatment. *Land*, 172 Wn. App. at 605.

Because it is improper to order plethysmograph testing at the direction of CCO or other DOC employees, the trial court erred in imposing the condition. The community custody condition should be amended to limit the CCO and DOC employees' authority to require plethysmograph testing for purposes of sexual treatment only.

20

B. *Condition Prohibiting Smith From Viewing or Listening To Pornographic Material as Determined by CCO*

Smith argues that the community custody condition prohibiting Smith from viewing or listening to pornographic material as determined by his CCO is unconstitutionally vague. The State concedes this issue, and we accept the State's concession.

"Many courts have held that sentencing conditions that prohibit access to or possession of pornography are unconstitutionally vague" because the term pornography has "never been given a precise legal definition." *State v. Bahl*, 164 Wn.2d 739, 754, 193 P.3d 678 (2008). The court in *Bahl* held that when a "community corrections officer can direct what falls within the condition," it makes the vagueness problem more apparent because it virtually acknowledges that on its face it does not provide ascertainable standards for enforcement. *Bahl*, 164 Wn.2d at 753, 758. The court in *Bahl* also explained that defining "pornography" is "'entirely subjective'" and "'may ultimately translate to a prohibition on whatever the officer personally finds titillating.'" *Bahl*, 164 Wn.2d at 755 (quoting *United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002)).

> The trial court imposed the following community custody condition at sentencing:
>
> (18) The defendant shall not view or listen to pornographic materials of any kind, including, but not limited to: magazines containing depictions of nude persons, video of nude persons, depictions of individual(s) engaged in sexual behaviors, or other materials or depictions of nude persons, sexual behaviors between persons as determined/defined by the CCO and the Sexual Offender Treatment Provider (SOTP).

CP at 61. This community custody condition includes an expansive definition of "pornographic materials," which partly relies on the term "as determined/defined by the CCO and the [SOTP]." CP at 61. Such a condition undoubtedly "may ultimately translate to a prohibition on whatever

21

the officer personally finds titillating.'"  *Bahl*, 164 Wn.2d at 755 (quoting *Guagliardo*, 278 F.3d at 872).  As such, the definition of "pornography," as contained in Smith's community custody condition, fails to put him on notice of which materials are prohibited.

Therefore, the condition is unconstitutionally vague as applied to Smith.

C.      *Condition Prohibiting Smith From "pursu[ing] intimate, romantic, or sexual relationships" Without CCO Approval*

Smith argues that the condition prohibiting him from "pursu[ing] intimate, romantic, or sexual relationships" without CCO approval is unconstitutionally vague.  The State concedes, and we accept the State's concession.

A term is unconstitutionally vague if it (1) does not define the offense with sufficient definiteness that ordinary people can understand what conduct is proscribed, or (2) does not provide ascertainable standards of guilt to protect against arbitrary enforcement.  *Bahl*, 164 Wn.2d at 752-53.

In *State v. Nguyen*, our Supreme Court stated that what makes a relationship "'romantic'". . . "'can be the subject of endless debate that varies across generations, regions, and genders.'"  191 Wn.2d 671, 682, 425 P.3d 847 (2018) (quoting *United States v. Reeves*, 591 F.3d 77, 81 (2d Cir. 2010)).  Instead, the term "dating relationship" was a more definite term, defined as "'a social relationship of a romantic nature.'"  *Nguyen*, 191 Wn.2d at 682 (quoting RCW 26.50.010(2)).  The *Ngyuen* court held that a prohibition on "romantic" relationships is unconstitutionally vague because the term is not sufficiently defined; instead, the court held that "dating relationship" withstands constitutional muster and is not unconstitutionally vague when used as part of a community custody condition.  *Nguyen*, 191 Wn.2d at 682.

22

Unlike the term "romantic," Washington courts have not defined "intimate" or "sexual" relationships in any published opinion. *See State v. Rumsey*, 17 Wn. App. 2d 1017, *review denied,* 198 Wn.2d 1011 (2021) (unpublished) (upholding the constitutionality of a condition prohibiting "any sexual and/or dating" relationship); *State v. Friedrich*, 12 Wn. App. 2d 1085 (2020) (unpublished). *See also State v. Chapa*, 6 Wn. App. 2d 1017, No. 50924-5-II, (Wash. Ct. App. Nov. 14, 2018)[7] (unpublished) (holding that the term "intimate relationship" is unconstitutionally vague). In *State v. Casimiro*, Division Three examined the constitutionality of a condition requiring the defendant to "notify the corrections officer and sex offender treatment therapist 'of any romantic or sexual relationship.'" 8 Wn. App. 2d 245, 251, 438 P.3d 137 (2019). Although it struck the term "romantic," it upheld the constitutionality of the condition, including the term "sexual relationship." 8 Wn. App. 2d at 251.

In addition, "'Intimate' is defined as 'of or relating to an inner character or essential nature.'" *Chapa*, 6 Wn. App. 2d at *7 (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 1184 (2002)). And, "'sexual' is defined as 'having sex' or 'involving sex.'" *Chapa*, 6 Wn. App. 2d at *7 (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 2082).

The trial court imposed the following community custody condition at sentencing:

> (19) The defendant shall not pursue intimate, romantic, or sexual relationships without prior authorization from the supervising CCO and sex offender treatment provider (SOTP).

CP at 61.

---

[7] *State v. Chapa*, No. 50924-5-II, 6 Wn. App. 2d 1017 (Wash. Ct. App. Nov. 14, 2018), https://www.courts.wa.gov/opinions/pdf/D2%2050924-5-II%20Unpublished%20Opinion.pdf

We agree with our previous, unpublished holdings that "intimate" is unconstitutionally vague because the definition as "of or relating to an inner character or essential nature" does not define the prohibited conduct with sufficient definiteness so that an ordinary person can understand what the proscribed conduct is. *Chapa*, 6 Wn. App. 2d at *7 (internal quotation marks omitted). "Intimate" may apply to familial relationships, romantic relationships, friendships, and other types of relationships. *Chapa*, 6 Wn. App. 2d at *7. Without additional clarification, "intimate" is unconstitutionally vague.

Therefore, we hold that the terms "romantic" and "intimate" are unconstitutionally vague and must be amended to include more definite terms.

D.      *Conditions Interfering with Smith's Fundamental Right To Parent*

Smith argues that the condition barring all contact with any member of VR's family interferes with his fundamental right to parent his biological child and VR's half-brother. The State concedes this issue, and we accept the State's concession.

Parents have a fundamental liberty interest in the "care, custody, and management" of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). The imposition of crime-related prohibitions is generally reviewed for abuse of discretion. *In re Pers. Restraint of Rainey*, 168 Wn.2d 367, 374, 229 P .3d 686 (2010). But courts more carefully review conditions that interfere with a fundamental constitutional right. *Rainey*, 168 Wn.2d at 374. A court necessarily abuses its discretion by violating an individual's constitutional rights. *State v. Iniguez*, 167 Wn.2d 273, 280, 217 P.3d 768 (2009). A court also abuses its discretion "if it bases its ruling on an erroneous view of the law." *State v. Crawford*, 164 Wn. App. 617, 621, 267 P.3d 365 (2011).

Sentencing conditions that interfere with the fundamental right to parent are subject to strict scrutiny, and they "must be reasonably necessary to accomplish the essential needs of the State and public order." *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008). They must be "sensitively imposed," with "no reasonable alternative way to achieve the State's interest." *Warren*, 165 Wn.2d at 32, 35. A court may not, as a matter of routine practice, impose a no-contact order that interferes with the fundamental right to parent. *Rainey*, 168 Wn.2d at 377-82. Instead, the court must consider whether the order is reasonably necessary in scope and duration to prevent harm. *Rainey*, 168 Wn.2d at 377-82. Less restrictive alternatives such as indirect contact or supervised contact may not be prohibited unless there is a compelling State interest in barring all contact. *Warren*, 165 Wn.2d at 35.

The trial court imposed the following conditions at sentencing:

(13) The defendant shall not have contact with minor children under the age of 18 years of age unless in the presence of a responsible adult who is capable of protecting the child and is aware of in the conviction, and contact has been approved advance by the CCO and the Sexual Offender Treatment Provider (SOTP).

(14) Have no contact with his victim, VR (DOB: 02/11/08) or any member of the victim's immediate family whether in person, through a third party, via mail (electronic or otherwise[)], or any other means.

CP at 61. The trial court also imposed a no contact order with VR for life and prohibited Smith from coming with 1,000 feet of VR's home, school, or workplace.

Smith is the biological father of VR's half-brother. As the conditions and no contact order are currently worded, they directly affect Smith's fundamental right to parent his minor son. The trial court did not engage in any discussion as to why including the broadly worded conditions 13 and 14 or why such wording was reasonably necessary in scope and duration to

25

prevent harm. *Rainey*, 168 Wn.2d at 377-82. VR made no allegations that Smith ever harmed his son. And, the trial court did not explain why the above restrictions are the least restrictive alternative are not feasible.

Because the conditions impose restrictions on Smith's right to parent his biological son, and because the trial court failed to support the imposition with an explanation of why such restrictive means are reasonably necessary for the protection of VR, the trial court abused its discretion by imposing the community custody conditions as they are currently worded.

Smith also argues that the no-contact provisions pertaining to VR's "immediate family" must be modified to allow for contact as part of a court process. Br. of Appellant at 75. We agree.

A no-contact order that prohibits contact with a parent must still allow for contact through the court or counsel sufficient to allow the other parent to seek contact with their shared child through the courts. *State v. McGuire*, 12 Wn. App. 2d 88, 90, 456 P.3d 1193 (2020). In *McGuire*, we held that a no contact order that "fails to provide any exception for contact through the courts or counsel, [places the defendant] in fear of violating the order should he attempt to seek or maintain contact with the child." *McGuire*, 12 Wn. App. 2d at 95.

Here, the no contact order extends to VR's mother, who is also Smith's son's mother. Should Smith pursue an action for a parenting plan concerning his son, he would be in violation of the no contact order. Such a prohibition violates Smith's constitutional right to parent his son. Therefore, the trial court erred when it failed to account for the necessity of allowing contact with VR's mother through the courts or through counsel.

The trial court erred in imposing unconstitutional and improper community custody conditions, and the conditions should be amended in accordance with the law.

E. *Department of Corrections Supervision Fees*

Smith argues that the trial court erred when it imposed DOC supervision fees after stating that it would impose only mandatory LFOs. We agree.

DOC supervision fees are discretionary LFOs, waivable by the trial court. *State v. Lundstrom*, 6 Wn. App. 2d 388, 396 n.3, 429 P.3d 1116 (2018). RCW 9.94A.703(2) provides that "[u]nless waived by the court, as part of any term of community custody, the court shall order an offender to: (d) Pay supervision fees as determined by the department."

When the record shows that the trial court intended to waive discretionary LFOs, we may strike the unintended fees. In *State v. Dillon*, 12 Wn. App. 2d 133, 152, 456 P.3d 1199 (2020), the defendant was found indigent and the trial court stated its intent to impose only mandatory LFOs, stating it would "simply order $500 victim penalty assessment, which is still truly mandatory, as well as restitution, if any." (Internal quotation marks omitted). Dillon's judgment and sentence stated he was subject to "supervision fees as determined by DOC." 12 Wn. App. 2d at 152 (internal quotation marks omitted). The *Dillon* court held: "From this record, it appears that the trial court intended to waive all discretionary LFOs, but inadvertently imposed supervision fees because of its location in the judgment and sentence." *Dillon*, 12 Wn. App. 2d at 152.

Similarly, the trial court discussed Smith's financial obligations and stated the following:

> The Court is going to find that Mr. Smith does not have the ability to meet his legal financial obligations, will impose the $500 crime victims fund, which is the mandatory portion. The $200 filing fee, the $100 DNA fee will be waived given

> prior–total of $500 will be paid at the rate of not less than $25 a month commencing sixty days after the date of release.

RP at 756-57. Despite the trial court's statement that Smith's total LFO's would be $500, the DOC supervision fees were included in the judgment and sentence form. From this record, as in *Dillon*, we conclude that the trial court intended to waive the fee but inadvertently imposed it.

The State argues that we should remand with instructions for the trial court to clarify whether it intended to impose only mandatory fees given Smith's indigence.[8] We reject the State's argument because the record is clear as to the trial court's intention. Therefore, the trial court intended to waive all discretionary fees, and it erred when it imposed the DOC supervision fee in the judgment and sentence.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL AND SMITH'S RIGHT TO TESTIFY

Smith also argues that he received ineffective assistance of counsel because his trial attorney failed to request clarification of the jury note, failed to object to the trial court's response, and failed to inform him of his right to testify. Because we agree that Smith is entitled to a new hearing on a motion for new trial, we do not address these arguments.[9]

---

[8] The State also argues that under *State v. Spaulding*, 15 Wn. App. 2d 526, 476 P.3d 205 (2020), the trial court is not prohibited from imposing the supervision fee against an indigent defendant. The argument misses the mark. Smith does not argue that the trial court was prohibited from imposing the supervision fee. Instead, Smith acknowledges that the supervision fee may be imposed, but that the trial court did not intend to impose it.

[9] We do not address these arguments on appeal in part because new counsel may wish to present evidence to the trial court on these issues.

V. STATEMENT OF ADDITIONAL GROUNDS

In his statement of additional grounds, Smith argues that trial counsel denied him the opportunity to testify, and he argues that the professionals who testified on behalf of VR were "coercive towards [him]" because they testified to incorrect facts. SAG at 1. We do not address Smith's right to testify as discussed above, nor do we address Smith's assessment of the witnesses' credibility because such an issue is not subject to review.

Appellate courts do not hear or weigh evidence, find facts, or substitute their opinions for those of the trier-of-fact. Instead, they must defer to the factual findings made by the trier-of-fact. *See e.g., Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 572, 575, 343 P.2d 183 (1959). "Judgment as to the credibility of witnesses and the weight of evidence is the exclusive function of the jury." *State v. Smith*, 31 Wn. App. 226, 228, 640 P.2d 25 (1982). Therefore, we do not reweight the evidence or substitute its judgment for the trial court's judgment. *Smith*, 31 Wn. App. at 228. "'Credibility determinations are for the trier of fact'" and are not subject to review. *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017) (quoting *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990)).

Here, Smith is asking this court to reevaluate the credibility of the witnesses offered by VR. But these determinations are not subject to review. Therefore, we do not consider Smith's argument.

CONCLUSION

We hold Smith cannot raise for the first time on appeal that the trial court committed constitutional error when it failed to share the entirety of the jury's note because the error is not manifest. We also hold that Smith's sentencing counsel was conflicted, and the trial court erred

No. 55665-1-II

in failing to inquire about the conflict. We hold that the community custody conditions on appeal are unconstitutional and must be modified in accordance with the law. We also hold that the trial court intended to waive all discretionary fees. We do not address whether trial counsel was ineffective because Smith is entitled to a new hearing on his motion for new trial on that issue. Lastly, we do not address the issues in Smith's SAG. Therefore, we reverse in part and remand with instructions for the trial court to appoint conflict free counsel to prepare and argue a motion for new trial and, if the motion for new trial is denied, the trial court shall modify community custody conditions in accordance with Smith's constitutional rights.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

Cruser, A.C.J.

Veljacic, J.

30